**In re RaeJean BONHAM, aka Jean Bonham, aka Jeannie Bonham, dba World Plus; World Plus, Inc., an Alaska corporation; and, Atlantic Pacific Funding Corp., a Nevada corporation, Debtors.**

**In re Bonham Recovery Actions, a proceeding to jointly administer certain pre-trial issues in numerous related adversary proceedings.**

**Bankruptcy No. F95–00897–HAR.**
**Adversary No. F95–00897–168–HAR.**

United States Bankruptcy Court,
D. Alaska.

April 7, 2000.

Cabot Christianson, Bundy & Christianson, Anchorage, Alaska, for trustee.

Brad Ambarian, Lane, Powell, Spears, Lubersky, Anchorage, Alaska, for defendants.

Ronald Goss, Ellis & Goss, Seattle, WA, for defendants.

Rebecca Copeland, Koval & Featherly, Anchorage, Alaska, for Joint Defense Committee.

John Burns, Borgeson & Burns, PC, Fairbanks, Alaska, for Joint Defense Committee.

Grant E. Courtney, Lane, Powell, Spears, Lubersky, Seattle, Washington, for defendants.

Pamela Scott, Sole Practitioner, Anchorage, Alaska, for Kenneth Wooten, defendant.

**MEMORANDUM DECISION DETERMINING THAT THE TRUSTEE HAS ESTABLISHED THAT DEBTORS OPERATED A PONZI SCHEME FROM 1989**

HERBERT A. ROSS, Bankruptcy Judge.

**Contents**                                                    **Page**

1. INTRODUCTION ................................................. 116
2. FACTUAL AND PROCEDURAL BACKGROUND ........................... 117
   2.1. General Overview ...................................... 117
   2.2. Overview of Debtors' Record Keeping System For the Ticket Business ........ 119
   2.3. The Trustee's Analysis in Detail ..................... 120
   2.4. The Analysis of Defendants' Expert Wayne Elggren, and the Trustee's Rebuttal .............................................. 126
3. ISSUES ...................................................... 131
4. ANALYSIS .................................................... 131
   4.1. The Experts Are All Qualified ........................ 131
   4.2. The Trial Court's Gatekeeper Function ................ 132
   4.3. Mr. Elggren "Gets the Gate" .......................... 135
   4.4. The Trustee's Analysis, Based on the Percentage Markup Method, is Reasonable and the Trustee Has Established a Six-Year Ponzi Scheme Beyond Question ...................................... 136
5. CONCLUSION .................................................. 137

1. *INTRODUCTION*—The debtors operated a business from 1984, by RaeJean Bonham first, and by all three later on, selling airline tickets procured by debtors using frequent flier miles purchased from brokers. Ticket revenues declined steadily from 1988 until an involuntary bankruptcy shut debtors down in December 1995. The business never generated a profit after 1988.

From 1988, the debtors procured numerous investors at an increasing rate, ostensibly to finance the ticket business, but whose investments were used almost exclusively to pay off earlier investors at exorbitant interest rates.

The trustee filed a number of fraudulent transfer actions seeking to recover money paid by the debtors to investors.[1] He has moved for summary judgment[2] to establish, among other things, that the debtors operated a Ponzi scheme from at least December 1989.

Some defendants oppose the motion to establish the existence of a Ponzi scheme. They argue that the losses debtors suffered may just as well have resulted from debtors having bled the funds from operations of a profitable ticket business.

I conclude that the trustee has established the existence of a Ponzi scheme through a meticulous reconstruction of the debtors' disarrayed records. Though the defendants' expert points to a number of

---

1. Many issues common to all defendants are being addressed in the present lead proceeding, *In re BONHAM RECOVERY ACTIONS*, a proceeding to jointly administer certain pretrial issues in numerous related adversary proceedings (referred to as the "BRA").

2. *Motion and Memorandum in Support of Motion for Partial Summary Judgment That Debt-*

or *Operated a Ponzi Scheme; and on Fraudulent Conveyance Causes of Action; and for Rule 54(b) Final Judgment for Preference Recipients and Against "Net Gainers" to the Extent of Their Net Gains,* Docket Entry 318 filed January 9, 1998, and Docket Entry 319 filed January 6, 1998.

alleged fallacies in the trustee's analysis, most are quibbling, inconsequential, or speculative. The one significant discrepancy is due to the expert's misinterpretation of undisputed facts—such that his expert opinion should be excluded under the court's *Daubert*[3] gatekeeper function as having no factual basis.

The following chart[4] graphically shows the existence of a Ponzi scheme from at least December 1989, expanded exponentially:

# Investment Income vs. Ticket Sales

—— Income from Investment    —•— Income from Ticket Sales

*That* is the picture of a Ponzi scheme.

### 2. FACTUAL AND PROCEDURAL BACKGROUND—

**2.1. General Overview**—This *Memorandum* is about whether the trustee has established that the debtors operated a Ponzi scheme for the six-year period before this bankruptcy case began on December 19, 1995. Thus, we must look back to the end of 1989.

A Ponzi scheme was described by the 9th Circuit Court of Appeals as:[5]

... an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists.

RaeJean Bonham, and her closely held corporations, World Plus, Inc. and Atlantic Pacific Funding Corp., operated an airline ticket business—Bonham from 1984, World Plus, Inc. from 1991, and Atlantic Pacific Funding Corp. from 1992—to December 1995, when a bankruptcy petition was filed. Ostensibly, to fund the travel business, debtors borrowed money, mostly from individuals on a relatively short-term basis, while offering extremely high interest. This borrowing began by Bonham in August 1988. I have described the debtors' operations in great detail in a published opinion regarding the issue of substantive consolidation.[6]

3. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); see discussion in Part 4.2.

4. A graphical representation of the table entitled *Investment Deposits as a Percentage of Total Revenue* at page 124 of this *Memorandum*.

5. *Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Technology Group, Inc.)*, 916 F.2d 528, 531 (9th Cir.1990) [citation omitted].

6. *In re Bonham*, 226 B.R. 56 (Bankr.D.Alaska 1998).

The trustee filed a number of adversary proceedings to avoid fraudulent transfers allegedly made to investors. He has moved for summary judgment to establish, among other things, that the debtors operated a Ponzi scheme.[7] Although there are numerous declarations and depositions of non-experts submitted by the parties on the Ponzi scheme issue, none delve into the financial details in depth or with rigor. This is principally a battle of experts.

At the oral argument on the trustee's motion, I announced my decision that the trustee had prevailed in establishing the factual existence of a Ponzi scheme and would not have to litigate that issue at trial. I have entered final judgments in a number of individual *BRA* adversary proceedings based on that oral ruling. There are some adversary proceedings which have since been withdrawn to U.S. District Court, and a number still pending in the U.S. Bankruptcy Court. This *Memorandum* is for the benefit of those proceedings remaining in the bankruptcy court.

In his summary judgment motion, the trustee alleges that the debtors were paying earlier investors with the proceeds from later investors in a business climate which was not generating sufficient income and profit to pay the investors anything at all from the ticket business.

The debtors did not keep books of account which complied with the requirements of good accounting practice, let alone generally accepted accounting principles. Bonham commingled funds between the two corporations and herself indiscriminately. The usual periodic financial statements in the form of balance sheets, income statements, or orderly cash receipt and disbursement journals, do not exist. In addition, Ms. Bonham has not cooperated with the trustee by promptly turning over to him what records she had. Nonetheless, the trustee has meticulously reviewed, assembled, and analyzed the records to recreate the contours of the debtors' business operations from 1988 through the date of the bankruptcy petition.

From the records, the trustee and his expert witness, E. Jayne MacPhee, have reconstructed the operations by recasting the financial history into more familiar financial statements, such as income statements. They have broken the business into two parts for analysis—one to isolate the operations of the ticket sale business, and the second to analyze the "investment" part of the business—to determine what patterns can be derived about how the debtors borrowed money through investment contracts and paid those contracts back throughout the six-year period and whether the ticket business carried itself.

The trustee concludes that the ticket sale business, based on the debtors selling tickets procured by purchase of frequent flyer mileage (almost exclusively on Delta Air Lines), was a money-losing front—a sham—to entice investors with the facade of legitimacy. He also concludes that money from new investors was used exclusively to pay old investors in a classic Ponzi scheme.

The defendants retained their own expert, F. Wayne Elggren, a CPA, a bankruptcy trustee, an insolvency accountant, and a fraud investigator with substantial experience and impressive qualifications and credentials. While the defendants question the expertise of the trustee and MacPhee, because of their lesser credentials and experience, the trustee has not questioned the qualifications of Elggren.

Mr. Elggren found numerous faults with the methodology and analysis of the trustee and MacPhee. Elggren concludes in a general way that there is too much unaccounted for cash and profits from the ticket business to say it was a sham.

He relies heavily on a "smoking gun" in the form of some testimony, pleadings and orders in the case alluding to $9,000,000 in ticket revenues—MacPhee came up with

7. *See,* Footnote 2.

only $6,000,000 and the trustee, $4,800,000. He has, however, misunderstood or been misadvised about the context in which the $9,000,000 ticket revenue figure came up in the main case—in the course of a settlement involving the amount of Delta Air Lines' claim—and he is hoisted on his own petard when he uses it to analyze the debtors' business history.

The balance of his criticisms are of such small size or consequence, or so speculative or inclusive, that they are akin to straining at gnats.

2.2. *Overview of Debtors' Record Keeping System For the Ticket Business* — [8] The debtors sold airline tickets, principally on Delta Air Lines, through storefront offices in Fairbanks and Wasilla. The airline tickets were generally procured using frequent flyer miles purchased from brokers of those miles.

The rudimentary record keeping system used by the debtors consisted of index cards listed alphabetically by customer. Stapled to these cards were receipts showing the amount paid by the customer and the balance owing.

The debtors also maintained reservation cards for each reservation by a customer. The reservation cards were primarily used to keep track of customers until the customer had traveled; they were kept in a "to-be-ordered" file until the tickets were purchased, usually shortly before the date of travel. After the customer traveled, they were placed in a "dead" file indicating that the transaction was completed. These dead files were arranged alphabetically also.

Money paid at the time of the reservation was generally entered into a deposit log or daily receipt log, from which bank deposit slips were usually created. Occasionally, cash receipts were not recorded in the logs. The trustee has located daily receipts for July–December 1990, and 1994, only.

The debtors kept track of the ticket sales in "broker books." There is one for each vendor of frequent flyer miles. There appears to have been five or six principal ones, although she may have used as many as fifty-one over the course of the business. In the broker book for the particular broker from whom frequent flier miles was being purchased, Ms. Bonham would record the name of the customer, destination, and airline.

She created monthly summary sheets from the broker books. From these sheets, Bonham prepared a list of customers that flew that month, the ticket price, the cost of the ticket, and the difference. These reflect the cost of goods sold and gross profit. Unlike financial records kept in accordance with good accounting practice, debtors' records did not exactly match up income and expenses in the same accounting periods. The summary sheets were collected in what Ms. Bonham referred to, in a pre-bankruptcy deposition with Delta Air Lines, as the "Red Binders."

The trustee and his staff physically counted the number of round-trip tickets sold as disclosed in the Red Binders for 1988–1992, 1994, and January 1995, and came up with 9,350.

Not all the summary sheets and accompanying broker books were located. The

---

**8.** Summarized principally from *Amended Defendants' Memorandum in Support of Opposition to Trustee's Motion for Partial Summary Judgment That Debtor Operated a "Ponzi" Scheme; and on Fraudulent Conveyance Causes of Action; and for Rule 54(b) Final Judgment for Preference Recipients and Against "Net Gainers" to the Extent of Their Net Gain* ["Defendants' Memorandum"], Docket Entry 661, filed October 5, 1998, at 11–15; and *Affidavit of Larry D. Compton in Support of Motion for Partial Summary Judgment That Debtor Operated a "Ponzi" Scheme; and on Fraudulent Conveyance Causes of Action; and for Rule 54(b) Final Judgment for Preference Recipients and Against "Net Gainers" to the Extent of Their Net Gain* ["First Compton Affidavit"], Docket Entry 322, filed January 6, 1998, at 5–7 (¶¶ 10–17).

trustee located these documents for 1988 through 1992, 1994, and for January 1995.[9]

2.3. *The Trustee's Analysis in Detail* —RaeJean Bonham began selling tickets in 1984.[10] In 1987 or early 1988, she moved to an office in the Northward Building in Fairbanks, and changed her business name to World Plus, which was a sole proprietorship.[11]

She was not a full-service travel agent, but only sold airline tickets procured with frequent flier miles.[12] She had only a few full time employees at any one time,[13] and employed her daughter, Stephanie, from time-to-time on a part-time basis.[14]

Tickets were generally procured by World Plus for its customers by calling Delta Air Lines directly, although other carriers were sometimes used. The customer usually paid for the ticket in advance, typically about $550 for a round-trip coach ticket from Fairbanks. Because operations like the debtors' were being monitored with progressive intensity by the airlines which felt the sale of frequent flyer miles or the use of sold miles was against airline policy, Bonham took pains to hide from the airlines the fact that she was acquiring tickets with purchased frequent flyer miles.

Bonham began issuing investment contracts in August 1988. She, World Plus, Inc., and Atlantic Pacific Funding Corp., collectively issued more than 7,000 contracts up to the time of the bankruptcy petition in the form of crude promissory notes.[15] Ms. Bonham began by offering 50% interest for 60 working days.[16] The interest rate was reduced to 50% every 8 months, and then 20% every 6 months. In late 1995, shortly before the business collapsed, debtors offered a rate as high as 50% interest in 3 months, and ultimately within 10 days.

Investors were told that the interest was available due to the success of the ticket sale business. Bonham indicated debtors purchased blocks of frequent flyer mileage from Fortune 500 companies such as IBM, Apple, Sony, Magnavox, Hewlett Packard, and Xerox, which she then sold at a substantial markup.[17] The sales pitch about purchasing miles from Fortune 500 corporations was untrue.[18] Bonham obtained all her tickets from wholesale frequent flyer ticket brokers.

---

**9.** *First Compton Affidavit,* ¶ 15, Docket Entry 322.

**10.** Deposition of RaeJean Bonham at 17–19, *Delta Air Lines, Inc. v. Seward et al.,* Case No. 1:93–CV–1036–HTW (NDGa), accompanying *Defendants' Memorandum,* Docket Entry 661.

**11.** *Id.* at 24.

**12.** *See, First Compton Affidavit,* ¶ 7, Docket Entry 322.

**13.** Declaration of Carol Walrath, ¶ 2 [*Affidavit of Gary Spraker (First Spraker Affidavit),* Docket Entry 323, filed January 6, 1998, Exhibit 11]; Declaration of Betty Ann Troyn, ¶ 2 [*First Spraker Affidavit,* Exhibit 12]; Declaration of Melanie Cook, ¶ 2, [*Index to Documents Supporting Statement of Facts,* Exhibit 10, Docket Entry 662 filed October 5, 1998].

**14.** Deposition of Stephanie Bonham DeGroot, at 107, 123–24 [*Index to Documents Supporting Statement of Facts,* Exhibit 12, Docket Entry 662].

**15.** *See, First Compton Affidavit,* at ¶ 20.

**16.** *See, First Compton Affidavit,* ¶ 18 and attached Exhibit 2.

**17.** *See,* Exhibit 1 to the Declaration of Noelle Martinez, Exhibit 5, *First Spraker Affidavit; see also,* Deposition of Tim Kellis, at 17 (sale of cruise miles supported 50% contracts), Exhibit 6, *First Spraker Affidavit.*

**18.** *See,* Plea Agreement in *United States v. Bonham,* USDC Case No. A97–0115–CR (HRH) (DAlaska), at 4; *Supplemental Affidavit of Gary Spraker (Second Spraker Affidavit),* Exhibit 19, Docket Entry 728 filed December 4, 1998; *see also,* Depositions of Phillip Wilson (Hewlett Packard), at 12–16; Leo Lucio (SONY), at 7–18; Clarence Bolivar (Apple Computer), at 6–14; and the Declaration of Paul Hardisty (IBM), Exhibit 10 to the *First Spraker Affidavit,* Docket Entry 323.

When the investment contracts were due, investors would either roll their investments over into a new contract or be paid according to their terms, or use some combination of the two. Bonham routinely encouraged investors to roll over maturing contracts into new ones.[19]

To keep track of and organize the large number of documents, the trustee developed a database with Quicken software. He input, to the extent that records were available, most of the pertinent financial transactions the debtors were involved in for which he could obtain a record. These included inputting information from bank accounts, deposits, checks, broker books and summaries, and investment contracts. The trustee did not attempt to input from the index cards the details regarding each customer's travel.

From the database, the trustee summarized the information about the investment contracts. With roll overs of maturing investment contracts and ever-expanding new contracts, the investment contracts outstanding from 1988 through 1995 are shown in the following table, prepared by the trustee's expert, Jayne MacPhee:[20]

| Year | Outstanding Investment Contracts at Year End |
|---|---|
| 1988 | $174,195.00 |
| 1989 | $746,294.00 |
| 1990 | $1,907,280.00 |
| 1991 | $4,133,296.00 |
| 1992 | $8,141,462.00 |
| 1993 | $15,687,067.00 |
| 1994 | $28,341,301.00 |
| 1995 | $50,510,618.00 |

The trustee also constructed financial statements for the debtors with the aid of the Quicken database in order to determine the profitability of the debtors' ticket business. The lack of some records hindered this process, but the trustee has, where necessary, subpoenaed bank records to fill in the gaps as best he could.[21]

The trustee has essentially retrieved complete deposit detail, i.e., the source and purpose of funds deposited into the debtors' accounts, for every year except 1989, though some detail is lacking for 1990.[22] The trustee was also able to identify debtors' disbursements by obtaining copies of canceled checks, and where necessary, additional supporting documents related to wire transfers and purchases of cashier checks. The database is reconciled to the debtors' bank statements.

MacPhee tested the database in order to verify its accuracy. She confirmed that the database reconciled to the bank statements, and she constructed two random samples and tested the source documentation to the input data.[23] MacPhee concluded that the trustee's categorizations of deposits and disbursements were proper, though due to the insufficient deposit detail for 1989 and part of 1990, the amount of unallocated deposits rendered the deposit allocation in the Quicken database unreliable for purposes of her analysis.[24]

Both sides agree that any analysis of the debtors' finances and profitability depend on a determination of their gross revenues and the appropriate costs of the ticket business. The parties reach differing figures for both the debtors' gross revenues and the costs of tickets. The following summarizes the trustee's methodology.

19. Plea Agreement, ¶ VII.8, *United States v. Bonham*, USDC Case No. A97–0115–CR (HRH).

20. See, *First MacPhee Affidavit*, Exhibit G, Docket Entry 320.

21. See, *First Compton Affidavit; see also, Affidavit of Carleen Mangold*, Docket Entry 321 filed January 6, 1998.

22. *First Compton Affidavit*, ¶ 33.

23. *Notice of Supplemental Affidavit of Jayne MacPhee in Support of Trustee's Motion for Partial Summary Judgment on Fraudulent Conveyance Causes of Action (Second MacPhee Affidavit)*, ¶¶ 7–8, Docket Entry 707 filed November 13, 1998.

24. *Second MacPhee Affidavit*, ¶¶ 10, 12; *Supplemental Affidavit of E. Jayne MacPhee (Third MacPhee Affidavit)*, ¶ 1, Docket Entry 729 filed December 4, 1998.

*Gross Revenue; Cost of Costs Sold Gross Margin* —MacPhee calculated the debtors' gross revenues by dividing the cost of debtors' purchases from frequent flyer mileage brokers (costs of goods sold) by the debtors' gross margin percentage.[25] She relied upon the cost of frequent flyer miles purchased as identified in the Quicken database as the most reliable source of information in this case.[26] She based this on the fact that most of the frequent flyer mileage brokers were located out of state, and the debtor routinely paid her suppliers by check. Also, ticket purchasers generally paid debtors in advance so there should have been little inventory of frequent flyer miles to account for.

MacPhee attempted to be conservative in her analysis to the benefit of the defendants. She points out that the amount of purchases of frequent flyer miles identified in the records that debtors turned over is lower than the larger amount identified in the Quicken database, and the debtors' records do not cover all the applicable years. The following table summarizes the cost of goods sold (COGS) figures used by MacPhee in her analysis:[27]

**Comparison of Ticket Purchases Per Quicken vs Debtors' Bank Accounts**

| Year | Ticket COGS [Per Bank Records, First *Compton Affidavit,* Exhibit 13] | Ticket COGS [Per Debtors' Business Records, *First MacPhee Affidavit,* ExhibitD] | Amount by Which Bank Records Exceed Debtors' Business Records | Percentage by Which BankRecords Exceed Debtors' Business Records |
|---|---|---|---|---|
| 1988 | 1,169,751.00 | 1,138,345.00 | 31,406.00 | 3% |
| 1989 | 885,623.00 | 833,135.00 | 52,488.00 | 6% |
| 1990 | 900,651.00 | 790,825.00 | 109,826.00 | 12% |
| 1991 | 713,888.00 | 581,833.00 | 132,055.00 | 12% |
| 1992 | 710,076.00 | 670,630.00 | 39,446.00 | 18% |
| 1993 | 546,395.00 | 524,049.00 | 22,346.00 | 4% |
| 1994 | 377,718.00 | 377,559.00 | 159.00 | 0% |
| 1995 | 145,476.00 | N/A | N/A | N/A |
| Totals | 5,449,578.00 | 4,916,376.00 | 533,202.00 | 8% |

To arrive at gross revenues from ticket sales, MacPhee divided the cost of the frequent flyer miles purchased by the gross margin percentage (the markup debtors made on their ticket sales) to determine the debtors' annual ticket sales.[28] The gross profit percentage was determined on an annual basis by averaging the ticket sales identified in the debtors' records.[29] The monthly summaries contain the debtors' cost of the ticket, the sales price, and the resulting net gain or loss, which is totaled on a monthly basis.

For those years for which no monthly summaries were available, MacPhee averaged the prior and subsequent year. The effect of this approach is to increase the debtors' ticket revenue as compared to that reported in the debtors' records. A summary of MacPhee's calculation of debtors' gross margin percentage is shown in the following table (which excludes the year the business crashed, in 1995):[30]

25. *Second MacPhee Affidavit,* ¶¶ 14–19; *Third MacPhee Affidavit,* ¶ 1.

26. *Third MacPhee Affidavit,* ¶ 1.

27. *First Compton Affidavit,* Exhibit 13, at 1–15; *First MacPhee Affidavit,* Exhibit E.

28. *Second MacPhee Affidavit,* Exhibits D and E; *Third MacPhee Affidavit,* Exhibits C and D.

29. *Second MacPhee Affidavit,* Exhibit D; *Third MacPhee Affidavit,* Exhibit D.

30. *First MacPhee Affidavit,* Exhibit D.

### MacPhee's Calculation of Gross Margins

| Year | Gross Ticket Sales per Business Records | COGS per Business Records | Gross Profit Before G & A per Debtors' Business Records | Gross Profit Percentage |
|---|---|---|---|---|
| 1988 | $1,227,825.00 | $1,138,345.00 | $ 89,480.00 | 7.29% |
| 1989 | $ 856,744.00 | $ 833,135.00 | $ 23,609.00 | 2.76% |
| 1990 | $ 854,431.00 | $ 790,825.00 | $ 63,606.00 | 7.44% |
| 1991 | $ 680,995.00 | $ 581,833.00 | $ 99,162.00 | 14.56% |
| 1992 | $ 786,676.00 | $ 670,630.00 | $116,046.00 | 14.75% |
| 1993 | $ 620,311.00 | $ 524,049.00 | $ 96,217.00 (estimates, as 1993 records not available) | 15.51% |
| 1994 | $453,948.00 | $377,559.00 | $ 76,385.00 | 16.83% |

***Debtors' Operating Costs, Owner's Draws, and Credit Card Payments*** —The parties also disagree as to calculation of the debtors' operating costs. MacPhee subtracted the operating expenses as set forth by the trustee in the Quicken database from gross profits (i.e., ticket sales derived from COGS, minus COGS) to arrive at net profit from the ticket business. The trustee identified each operating expense by check number, amount, payee, and the date the check cleared the debtors' account.[31] MacPhee also deducted the debtors' payments made for personal expenses.[32]

Numerous payments were made for the Bonham's personal benefit, or the benefit of her family, including trips, purchases of cars, heavy equipment for her husband's business, and payments on behalf of her son and daughter.[33] The trustee categorized these payments as "Owner's Draws" in the database.[34]

Additionally, the debtor had significant credit card expenses which were predominantly for personal use, but also included business expenses such as direct purchases of tickets from traditional airline carriers. The trustee did not itemize the individual credit card charges, but aggregated the credit card payments in the category "Credit Cards" in the database.[35]

Using MacPhee's analysis (revised to reflect those items identified by the defendants in *Defendants' Memorandum*) the debtors' ticket business made a net profit only for 1988, but failed to cover its operating expenses thereafter. Her calculations are shown in the following table:[36]

### Debtors' Profit (Loss) from the Ticket Business Alone

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|
| Ticket Revenue | 1,261,731 | 913,855 | 1,017,706 | 821,477 | 832,934 | 646,698 | 452,559 | 262,416 |
| Ticket COGS | 1,169,751 | 888,632 | 931,710 | 701,077 | 710,077 | 546,395 | 377,393 | 218,251 |
| G & A Expenses | 33,129 | 64,633 | 111,147 | 134,152 | 151,199 | 177,927 | 157,726 | 68,687 |
| Net Profit (Loss) | 58,851 | (39,410) | (25,151) | (13,752) | (28,342) | (77,624) | (82,560) | (24,522) |

Considering the debtors' personal expenses included in the "Owner's Draws" and "Credit Cards" categories, the ticket business shows significant losses for every year including 1988, as shown in the following table:[37]

31. *First Compton Affidavit*, Exhibit 13.

32. *Second MacPhee Affidavit*, ¶ 15, Exhibit E; *Third MacPhee Affidavit*, ¶ 5, Exhibit C.

33. *Second Compton Affidavit*, ¶¶ 8 and 13, Exhibits 22 and 26 (prior to December 1989).

34. *First Compton Affidavit*, ¶ 31, Exhibit 15.

35. *First Compton Affidavit*, ¶ 31, Exhibit 17, at 1–8.

36. *Second MacPhee Affidavit*, Exhibit C.

37. *Third MacPhee Affidavit*, Exhibit C.

### Debtor' Profit (Loss) From Ticket Operations

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|
| Ticket Revenue | 1,261,731 | 913,855 | 1,017,706 | 821,477 | 832,934 | 646,698 | 452,559 | 262,416 |
| Ticket COGS | 1,169,751 | 888,632 | 931,710 | 701,788 | 710,077 | 546,395 | 377,393 | 218,251 |
| G & A Expenses (*First Compton Affidavit,*[38] Exhibit 13) | 33,129 | 64,633 | 111,147 | 134,152 | 151,199 | 177,927 | 157,726 | 68,687 |
| Owner's Draws (*First Compton Affidavit,* Exhibit 15) | 103,031 | 167,957 | 142,558 | 116,525 | 160,807 | 144,918 | 73,043 | 36,031 |
| Credit Cards (*First Compton Affidavit,* Exhibit 17 | 17,397 | 38,701 | 72,238 | 86,088 | 90,608 | 119,213 | 88,662 | 77,159 |
| Net Profit (Loss) from Travel Operations | (61,577) | (246,068) | (239,947) | (217,076) | (279,757) | (341,755) | (244,265) | (137,712) |

Using the total deposits in the Quicken database, MacPhee also quantified the debtors' investment-related deposits and disbursements. Because the debtor had only two sources of revenue, the sale tickets and the issuance of investment contracts, all non-ticket revenues were investment deposits. The trustee did not, however, arbitrarily place deposits in the investment category which obviously do not belong there. For example, deposits that, by virtue of their odd amount, did not look like they were to purchase investment contracts were generally considered travel income.

MacPhee reconciled her figures with the Quicken database by conservatively (i.e., favorably to the defendants) characterizing most of the unallocated income as ticket income.[39] Defendants have not presented any evidence or otherwise specifically challenged MacPhee's allocations except to argue that it overstates investments and understates the ticket business.

While ticket revenues fell steadily from $1,261,731 in 1989, to $262,416 in 1995, the investment aspect of debtors' operation assumed greater and greater importance until it amounted to over 98% of her entire cash flow, measured by revenue. The following two tables compare the ticket revenue to the investment operations. The first was compiled by MacPhee,[40] using $177,043 for 1995, and the second using $262,416 as well as other adjustments claimed by defendants to more accurately reflect debtors' business:

38. *First Compton Affidavit.*

39. *Second MacPhee Affidavit,* Exhibit F.

40. *Second MacPhee Affidavit,* ¶ 21 and Exhibit F.

**Investment Deposits as a Percentage of Total Revenue**

| Year | Travel Revenue | | Investment Revenue | | Total Deposits |
|------|---------------|--------|-------------------|--------|---------------|
| | Dollars | Percent of total | Dollars | Percent of total | |
| 1988 | $1,261,731 | 84% | $232,343 | 16% | $1,494,074 |
| 1989 | $910,760 | 53% | $803,573 | 47% | $1,714,333 |
| 1990 | $973,046 | 42% | $1,353,306 | 58% | $2,326,352 |
| 1991 | $821,381 | 25% | $2,406,530 | 74% | $3,227,911 |
| 1992 | $832,934 | 17% | $4,205,760 | 83% | $5,038,694 |
| 1993 | $646,698 | 7% | $8,233,308 | 93% | $8,880,006 |
| 1994 | $442,008 | 4% | $9,821,407 | 96% | $10,263,415 |
| 1995 | $177,043 | 1% | $15,029,265 | 99% | $15,206,308 |
| Total | $6,065,601 | 13% | $42,085,492 | 87% | $48,151,093 |

Incorporating the errors noted by the Elggren report, the result is substantially the same as shown in the following table (the shaded areas show the changes from the previous table; there is only a 2% change favorable to defendants in 1990 and 1% in 1995):

**Investment Deposits as a Percentage of Total Revenue [Adjusted for Alleged Errors Noted by Defendants.]**

| Year | Travel Revenue | | Investment Revenue | | Total Deposits |
|------|---------------|--------|-------------------|--------|---------------|
| | Dollars | Percent of total | Dollars | Percent of total | |
| 1988 | $1,261,731 | 84% | $232,343 | 16% | $1,494,074 |
| 1989 | $913,855 | 53% | $800,478 | 47% | $1,714,333 |
| 1990 | $1,017,706 | 44% | $1,308,646 | 56% | $2,326,352 |
| 1991 | $821,477 | 25% | $2,406,434 | 75% | $3,227,911 |
| 1992 | $832,934 | 17% | $4,205,760 | 83% | $5,038,694 |
| 1993 | $646,698 | 7% | $8,233,308 | 93% | $8,880,006 |
| 1994 | $452,559 | 4% | $9,810,856 | 96% | $10,263,415 |
| 1995 | $282,410 | 2% | $14,943,892 | 98% | $15,206,308 |
| Totals | $6,209,376 | 13% | $41,941,717 | 87% | $48,151,093 |

Comparing the relatively modest ticket revenue to the enormous accruing unpaid investment interest dramatically shows the fallacy of defendants' claim that debtors were conducting a profitable ticket business. Even ignoring operating expenses, credit cards, and owner's draws, the debtors' ticket operation never came close to covering the interest that was accruing on debtors' investment contracts as shown in the following table (in which the operating expenses and owner's draws are shaded):

**Ticket Revenue and Profitability Compared to Interest Accrual (in Thousands)**

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|------|------|------|------|------|------|------|------|------|
| Gross Ticket Profit, (i.e., before G & A Expenses) [41] | 92 | 25 | 86 | 120 | 122 | 100 | 75 | 44 |
| Net Profit [Loss] from Travel Operations [42] | (62) | (246) | (239) | (217) | (279) | (341) | (247) | (137) |
| Accrued Interest Expense [43] | (159) | (719) | (1,826) | (3,962) | (7,937) | (15,430) | (28,272) | (50,519) |

*Balance Sheet* —MacPhee's analysis shows that the debtors were continuously insolvent from 1988 through 1995, as shown in the following table: [44]

41. *See,* table at 17.

42. *See,* table at 18

43. *See, Second MacPhee Affidavit,* Exhibit H.

44. *See, Second MacPhee Affidavit,* Exhibit H.

## Debtors' Summarized Balance Sheet (Amounts Are In Thousands)

| Year | 1988 | 1989 | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|---|---|
| Assets | 15 | 27 | 82 | 171 | 205 | 258 | 69 | (9) |
| Liabilities | 174 | 746 | 1,907 | 4,113 | 8,141 | 15,687 | 28,341 | 50,510 |
| Net Worth | (159) | (719) | (1,826) | (3,962) | (7,937) | (15,430) | (28,272) | (50,519) |

2.4. *The Analysis of Defendants' Expert Wayne Elggren, and the Trustee's Rebuttal* —I will summarize the analysis of defendants' expert, Wayne Elggren, and the trustee's responses.

***Flaws in Trustee's Analysis and Failure to Account for Overall Ticket Volume/Ticket Sales***[45]—The central thesis of Wayne Elggren's criticism of the methodology of the trustee and MacPhee is that they went about the analysis incorrectly, and that they failed to explain $2–3,000,000 of potential ticket revenue. Elggren believes that in a proceeding in the main case regarding a settlement of the Delta Air Lines' claim, it was established and accepted by the court that the debtors' business generated at least $9,000,000 in Delta Air Lines' ticket revenues.

Elggren theorizes the possibility of $1,500,000 gross profits (sufficient to pay much of the general and administrative expenses), and compares it to MacPhee's calculations as follows:

| | 1988–1996 per Eiggren | | 1988–1995 per MacPhee | |
|---|---|---|---|---|
| Ticket Sales | 9,000,000 | 100.00% | 6,065,601 | 100.00% |
| Less: Cost of Tickets Sold | 7,500,000 | 83.33% | 5,429,151 | 89.50% |
| Gross Margin | 1,500,000 | 16.67% | 636,451 | 10.50% |

The trustee responds that Mr. Elggren has misinterpreted the import of the hearing on July 28, 1997, in the *Bonham* main case involving the settlement of the Delta Air Lines' proof of claim. The court was personally involved and agrees that the $9,000,000 figure bandied about at that hearing was an artificial one generated by Delta to illustrate how much damages would be awarded by the U.S. District Court in Georgia under applicable case law regarding the "stowaway doctrine." Under that doctrine, Delta claimed it was entitled to damages based on the debtors' misuse of frequent flyer miles to reimburse Delta the entire cost of a *one-way ticket* at the lowest rate available at the time. Delta argued that, conservatively and considering only a one-way trip from Fairbanks or Anchorage to Seattle at the lowest rate, damages of about $9,000,000 would be generated.

This figure was arrived at by Delta's analysis of the reservation cards in which it had determined that there were about 19,906 one-way trips at about $456.84 per ticket.[46] The trustee contends that most people travel on a round-trip fare. The trustee had counted about 9,350 tickets, which is within about 600 of the 9,953 (turning Delta's one-way trips into round-trips). In fact, the trustee's calculations about the number of tickets is amazingly close to Delta's.

There is no "$9,000,000 in ticket revenue" which has been acknowledged in this case, either by the trustee or the court.

The defendants, nonetheless, used the $9,000,000 figure and estimated that the cost of tickets sold was 83.33% of the gross ticket sales. The cost-of-tickets-sold figure was derived not from Ms. Bonham's records, but through the cursory affidavit

45. *Supplemental Declaration and Report of F. Wayne Elggren,* ¶¶ 18–27, Docket Entry 670, filed October 8, 1998.

46. *See, Affidavit of Jeffrey W. Willis* (Delta's attorney), Docket Entry 727, filed December 4, 1998.

of Bryan Wilson, the office manager at Discount World Travel, from 1986–1989. Discount had itself sold frequent flyer mileage before it quit in 1989. There is no indication that Mr. Elggren actually looked at the books of Discount.

Elggren also criticized MacPhee's gross ticket sales figure of $6,065,601 on the basis that she used improper methodology. He said she should have added up all the reservation cards to arrive at a more reliable ticket income figure, but did not himself attempt to do so, either for all the reservation cards or by some method of sampling.

Elggren argues that MacPhee and the trustee ignored material evidence of significant cash transactions.[47] He does this based on the following:

- RaeJean Bonham's daughter, Stephanie, who worked in the business, said that approximately one-half of the ticket transactions were paid in cash and the other half paid by check. This indicates to Elggren that some of the cash may never have made it to a bank account.[48]

- Elggren gives four examples of mischaracterizations of cash transactions totaling $14,705 by the court's calculation[49] (although the trustee calculates these to total $16,280).[50]

The trustee responded that he has accounted for over $5,000,000 in cash deposits, about $2,000,000 for ticket sales and the rest in unallocated cash deposits.[51] Also, the trustee notes that MacPhee's principal methodology in reconstructing the operations used the cost of the ticket sales (i.e., adding up the payments the debtors made to ticket brokers), which does not rely on the individual deposits of purchasers, cash or otherwise. The trustee points out that, under the percentage markup method, the amount of ticket revenue calculated (whether you use MacPhee's percentage markup or Elggren's 83.33% COGS) is not effected by Ms. Bonham's use of cash.

MacPhee's suggests that the best method of determining gross sales is to find out what the debtors paid to ticket brokers to purchase the tickets that they sold to customers. She reasoned that this was one of the most reliable figures for analyzing the debtors' operations because it was derivable from debtors' checks and broker summaries. Also, since the tickets were generally paid for in advance by the customers, and not ordered until just before needed from brokers, there would be little inventory to account for. Using cost-of-tickets-sold percentages derived from debtors' own broker summaries, she arrived at a cost of goods sold of $5,429,151 and an average 89.50% COGS.

Even using Elggren's unsupported 83.33% gross margin percentage to derive gross sales, the ticket sales would only have been increased by an amount of little less than $500,000, or $6,515,242. This still leaves the ticket business woefully under water. Conversely, using the $9,000,000 suggested by Elggren, and the 89.50% average gross profit percentage derived from debtors' records by MacPhee, the gross margin is only $945,000, instead of the $1,500,000 suggested by Elggren. The following table may make this more understandable (using Elggren's $9,000,000 gross ticket revenue, MacPhee's COGS, and applying the gross profit percentage to each as found by the other party):

---

47. *Supplemental Declaration and Report of F. Wayne Elggren,* ¶ 28, Docket Entry 670.

48. *Id.* at ¶ 29.

49. *Id.* at ¶¶ 30–32.

50. *Plaintiff's Reply Memorandum to Defendants' Consolidated Opposition to Motion for* *Partial Summary Judgment,* ¶ B.1, at 9, Docket Entry 726 filed December 4, 1998.

51. *Supplemental Affidavit of Larry D. Compton,* Docket Entry 730 filed December 4, 1998.

| | 1988–1995 (Income per Elggren; Gross Margin Percentage per MacPhee) | | 1988–1995 (Gross Margin Percentage per Elggren, COGS per MacPhee) | |
|---|---|---|---|---|
| Ticket Sales | 9,000,000 | 100.00% | 6,515,242 | 100.00% |
| Less: Cost of Tickets Sold | 8,055,000 | 89.50% | 5,429,151 | 83.33% |
| Gross Margin | *945,000* | 10.50% | *1,086,091* | 16.67% |

Compare this to Elggren's hypothesis as shown again in the following table: [52]

| | 1988–1995 per Elggren | | 1988–1995 per MacPhee | |
|---|---|---|---|---|
| Ticket Sales | 9,000,000 | 100.00% | 6,065,601 | 100.00% |
| Less: Cost of Tickets Sold | 7,500,000 | 83.33% | 5,429,151 | 89.50% |
| Gross Margin | *1,500,000* | 16.67% | *636,451* | 10.50% |

Elggren argues that "the reservation cards could have been a more complete source of information to evaluate ticket sales." [53] He also argues that the trustee should have gotten information about the frequent flyer mileage purchases from the fifty-one mileage brokers.[54]

Elggren, himself, did not attempt to extract the information or analyze the data from the reservation cards to demonstrate that MacPhee's calculations are grossly inaccurate. Nor, has he questioned the accuracy of the cost of tickets (i.e., the cost of buying frequent flyer miles from brokers), except to say the trustee should have attempted to get information from the brokers directly. The defendants listed some of the brokers as potential deponents in the *BRA* case management proceedings to prepare for defending against the summary judgment. Apparently, the defendants were unsuccessful in getting this information from the brokers themselves, so they are hard put to criticize the trustee for not doing so.

***Failure to Recognize Credit Card Transactions***—Elggren states that Rae-Jean Bonham used credit cards to pur-

chase airline tickets "from various discount ticket brokers." [55] Elggren identified $21,647.18 in ticket purchases made with debtors' credit cards. The trustee explained that these were not purchased from frequent flyer ticket brokers, but were credit card purchases made with regular airlines such as Northwest or Alaska Airlines, and appear to be for the use of herself and her friends over an eight-year period.[56]

***Failure to Reconcile to Reservation Cards***[57]—Elggren again alludes to the fact that at another time in this case the trustee, using principally the debtors' broker books and summaries instead of the individual reservation and/or index cards, came up with approximately 9,350 tickets. Elggren suggests there is a "discrepancy" because Delta Air Lines, in its analysis of the debtors' operations, came up with an estimate of 19,906 tickets, and even James DeWitt, an attorney for the trustee, calculated the number of tickets sold to be 18,500.

This has been previously discussed in this *Memorandum*. The 19,906 or 18,500 are *hypothetical* one-way trips for the pur-

---

52. Reproduction of the table shown at page 23 of this *Memorandum*.

53. *Supplemental Declaration and Report of F. Wayne Elggren*, ¶ 23.

54. *Notice of Filing Faxed Declaration and Report*, at ¶ 16, Docket Entry 558, filed June 15, 1998.

55. *Id.* at ¶¶ 33–35.

56. *Plaintiff's Reply Memorandum to Defendants' Consolidated Opposition to Motion for Partial Summary Judgment*, ¶ C.1, at 15, Docket Entry 726 filed December 4, 1998.

57. *Supplemental Declaration and Report of F. Wayne Elggren*, ¶¶ 37–39.

poses of calculating damages under the stowaway doctrine, and not the more usual round-trips, which would generate half the figure that Delta or Mr. DeWitt arrived at. Essentially, the number of actual tickets arrived at by Delta, DeWitt, and Compton, are very close.

***Failure to Include Wasilla Records***[58]— Elggren claims that MacPhee failed to account for ticket sales in the Wasilla office. The trustee has countered that those sales are included in the Quicken database and that there was no separate bank account for the Wasilla office. Secondly, even if Wasilla had been missed, there is no indication that tickets were purchased out of the Wasilla location, and MacPhee has accounted for all frequent flyer miles purchased from brokers and used that figure to arrive at a gross sales figure.

***Failure to Include All World Plus Transactions***[59]—Elggren argues that the trustee has omitted a bank account, and mentions some checks for the time period between September 1987 and January 1988.

The trustee counters that he has analyzed all checking accounts, going to banks when he could not find bank statements or deposit detail elsewhere to get copies of the checking and deposit information. The checking account that Elggren identifies was located at the First National Bank of Fairbanks, East College Branch, had a balance of about $300 in March 1989, and was never substantially used after that. As such, it has little bearing on the issue of whether debtors conducted a Ponzi scheme from December 19, 1989, through December 19, 1995.

***Failure to Properly Allocate and Identify Deposits***[60]—Elggren says that a little over $1,100,000 of deposits for the year 1989 were unallocated.

The trustee responds that those allocation figures were indeed provided to defendants' counsel after the trustee's motion was filed.[61]

***Failure to Properly Allocate General and Administrative Expenses***[62]—Elggren criticizes the trustee for not allocating general and administrative expenses between the "travel business" and the "investment business."

The trustee responds that, although the investment activity of the debtors was broken out for analysis purposes, there was no separate "investment business" as such. There was only the business of selling airline tickets; the procurement of funds through investment contracts was supposedly an adjunct to carrying on that business. All the general and administrative expenses are properly charged to travel business to determine if that aspect of the business ever made money doing what it claimed to do, selling tickets.

In addition, the trustee has shown by yearly analysis how the business failed to make a profit each year from 1989, until it closed in December 1995. For the purposes of the fraudulent conveyance actions, the trustee only seeks to recover transfers that occurred no earlier than about December 19, 1989. By analyzing the business from 1988, and showing the increase in investment contracts from their inception that year, the trustee has established that the business of selling tickets was losing money at an accelerating rate while investment contracts increased exponentially.

***Failure to Properly Allocate Owner's Draws***[63]—Elggren argues that these are

---

**58.**  *Id.* at ¶ 40.

**59.**  *Id.* at ¶¶ 41–43.

**60.**  *Id.* at ¶ 44.

**61.**  *Plaintiff's Reply Memorandum to Defendants' Consolidated Opposition to Motion for Partial Summary Judgment,* ¶ B.4, at 12–13.

**62.**  *Supplemental Declaration and Report of F. Wayne Elggren,* ¶¶ 45–47.

**63.**  *Id.* at ¶¶ 48–50.

improperly handled from a financial accounting perspective and that the draws should have more properly been allocated to dividends, which do not impact the profit and loss statement. Secondly, he said that, even if properly expensed, they should have been allocated between the travel business and the investment business.

The trustee responds again that there were not separate businesses, and that allocation between investment and travel is not required. The trustee notes that the inference to be drawn from the debtors' free use of funds over the years when the ticket operation was barely making a gross profit is indicative of the debtors' intent to hinder, defraud, and delay by operating a Ponzi scheme. This money had to come from investment contracts and not the ticket business.

*Changes in MacPhee Reports*[64]—Elggren criticizes MacPhee for changes in her report of June 1998, from the original report in December 1997. The changes are:

| Report Date | Ticket Income | Investment Deposits | Total Deposits |
|---|---|---|---|
| June 8, 1998 | $6,065,604 | $42,085,492 | $48,151,096 |
| December 7, 1997 | $6,089,769 | $41,853,848 | $47,943,617 |
| Difference | ($24,165) | $231,644 | $207,479 |

In addition, Elggren indicates that MacPhee was able to identify an additional $1,642,187 previously unidentified. MacPhee was apparently refining her analysis with updated data. Elggren does not explain the material significance of his criticism of the less than ½% variations he has unearthed.

*Assumed "Ponzi" Scheme*[65]—Elggren criticizes the trustee for jumping to the conclusion that there was a Ponzi scheme from the inception of World Plus in 1988. He says that the trustee has on numerous occasions improperly categorized transactions negatively impacting the travel operations. Other factors that he finds militate against the finding of a "Ponzi" scheme are:

- Unlike a classic "Ponzi" scheme in which there is no underlying business enterprise, only investor money changing hands, World Plus operated an income-producing airline ticket business. Apart from use of new investor funds to pay returns to old investors, the most distinctive characteristic of a "Ponzi" scheme is absence of a profitable product or efforts to make profits through a productive business enterprise.
- The approximate seven-year life span is significantly longer than the usual three to four years or less life span of a typical Ponzi scheme.
- Most Ponzi schemes involve a network of sales agents to recruit new investors to sustain the geometric growth; here, there is no evidence of the use of sales agents.
- The nature of the World Plus travel business suggests that it was "in fact, a business enterprise and not a fraudulent scheme from the outset."

Elggren contends that most Ponzi operators usually cut and run after they hit the top and the scheme begins to collapse. He said that Ms. Bonham did not. The trustee says she stayed and got convicted of having operated a Ponzi scheme.

Elggren also argues that an interest rate of 20% to 50% over a two- to eight-month period, or 60% annualized, was not in and of itself indicative of a Ponzi scheme. Elggren cites mutual funds which have had substantial rates of return, some as high as almost 70% per year. Finally, he says that the issuance of new debt instruments to raise money to pay off existing debt is not in and of itself indicative of a Ponzi scheme.

MacPhee points out that in many high profile Ponzi schemes that have reached the courts, the business has operated about as long or longer than World Plus. For example, Chilcott Futures Fund (nine

---

**64.** *Id.* at ¶ 51.

**65.** *Id.* at ¶¶ 52–56.

years), Hedged Investment Associates (fourteen years); M & L Business Machine Co., Inc. (at least seven years). To which, the court would add Bennett Funding, possibly the largest Ponzi scheme in United States history (1990–1996, and probably several years before).[66] Many Ponzi schemes, if not most, have some legitimate business operation, or at least the facade of one. See, for example, Bennett Funding, Agricultural Research and Technology Group, Inc., M & L Business Machine Co., Inc., etc.

The comparison to mutual funds which have achieved a high interest rate is not apropos. Those mutual funds presumably did not guaranty that high of an interest rate, which debtors contractually did in their investment contracts.

***Summary and Conclusion***[67]—Elggren concludes that:

- The trustee ignored relevant information.
- The trustee relied heavily on gross margin calculations in order to arrive at estimated ticket sales, and his analysis and conclusions depend on these calculations, which are unreliable.
- The trustee's conclusions and opinions are based on improper methodology in that he "backed into" estimated ticket sales by "applying gross margin analysis to ticket expense per the Quicken database."
- The trustee miscalculated annual ticket expenses and gross margin percentages so his estimated ticket sale figures are understated and incorrect.
- The trustee attempted to improve the accuracy and reliability of his estimated ticket sale figure by reallocating deposits contained within the ticket database, but the method of reallocation appears to be improper and arbi-

trary, depending only on unreliable figures.

- The trustee allocated deposits based only on his unreliable figure of estimated ticket sales, i.e., the "estimated ticket sales" have been turned into a "target figure" and all other reallocations are aimed at this target or plugged figure.
- The trustee and his attorneys have compiled the data and Quicken database and MacPhee has not been involved with the compilation and organization of the source data, nor in the creation of the Quicken database.
- All of this has led to the biased conclusion that a Ponzi scheme existed based on unreliable and biased data.

To which Elggren signed his name "under penalty of perjury" under the name of the accounting firm Arthur Andersen & Co.

3. *ISSUES*—The issue to be resolved by this *Memorandum* is whether, for the purposes of summary judgment, the trustee has established without substantial controversy (i.e., so he does not have to try the facts) that the debtors operated a Ponzi scheme with respect to their issuance of investment contracts for at least six years before the original petition was filed.[68]

This is mostly a battle of the experts, so the court must determine whether the trustee's experts are qualified (the trustee not having challenged Elggren's qualification), and, even if an expert on either side is qualified, whether the court, in its gatekeeper function, should allow the expert's testimony.

4. *ANALYSIS*—

4.1. *The Experts Are All Qualified*—The trustee does not challenge Elggren's qualifications as an expert in forensic fraud investigation, qualified to investigate and

---

66. *See,* complaint in *Kronfeld v. Bennett,* Case No. 96 Civ 2583 (United States District Court for the SDNY) which can be viewed at http://securities.stanford.edu/cases/bennett.html.

67. *Supplemental Declaration and Report of F. Wayne Elggren,* at 19–20.

68. FRCP 56(d), incorporated by FRBP 7056.

expertly testify to matters regarding Ponzi schemes. The defendants, however, challenge the expertise of both MacPhee and the trustee.

■ The qualifications are governed by FRE 702:[69]

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Accounting testimony can be the subject of expert testimony.[70]

The defendants have focused their criticism on MacPhee's lack of a CPA degree or certification in certain groups of accounting fraud detection professionals. First, this seems to miss the point about the type of expert needed in this case. Few would question that Ms. Bonham acted in a fraudulent manner in the time period closer to December 1995. After all, she is sitting in jail for federal criminal charges where she admitted as much in her guilty plea. The real question is when this pattern began.

■ The type of expertise truly needed in this case is someone who can take poorly kept, incomplete records, involving commingled funds, and reconstruct the business out of them. MacPhee has training in accounting matters and experience in forensic accounting situations. She has worked as an accounting analyst reconstructing what really happened in the M & L Business Machine case, one of the major Ponzi schemes to reach the bankruptcy courts. Experience and training, despite the lack of a specific degree or designation, qualify her to render an expert opinion on accounting matters related to the reconstruction or analysis of business records, especially when a Ponzi-type business, with commingling of funds, is suspected.[71]

While she does not have the credentials of belonging to all the professional groups that Mr. Elggren does, she has accounting training and experience in working on Ponzi cases, and has done an admirable job in assisting the court in understanding the debtors' operations—a much more intellectually honest job than Mr. Elggren at that. She qualifies as an expert in reconstructive accounting in a situation where the books and records are incomplete and not up to standards, and the funds of the debtors are commingled.

■ Likewise, the trustee, even though he is a party, may qualify as an expert, even though his bias can be challenged.[72] He is a CPA and a panel trustee in Alaska, which have given him on-the-job experience in understanding and reconstructing financial transactions.

■ 4.2. *The Trial Court's Gatekeeper Function*—Often, declarations of non-expert witnesses, offering relevant, admissible testimony, are filed in order to defeat a summary judgment motion and controvert the declarations of the movant. The court must not weigh the strength of the opposing parties' testimony, but should instead give the benefit of all reasonable inferences regarding the contested facts to the nonmoving party.[73] If there is more than a scintilla of evidence presented by the nonmovant, the court should not decide the matter based on who presented the

---

**69.** FRE 702, incorporated in bankruptcy proceedings by FRBP 9017.

**70.** *Computer Systems Engineering, Inc. v. Qantel Corp.,* 740 F.2d 59, 67 (1st Cir.1984).

**71.** *United States v. Garcia,* 7 F.3d 885, 889 (9th Cir.1993).

**72.** *Hingson v. Pacific Southwest Airlines,* 743 F.2d 1408, 1412–13 (9th Cir.1984); *Dunn v. Sears, Roebuck & Co.,* 639 F.2d 1171, 1174 (5th Cir.1981); *Independent Living Resources v. Oregon Arena Corp.,* 982 F.Supp. 698, 784 and fn. 116 (D.Or.1997).

**73.** *Lewis v. Scott (In re Lewis),* 97 F.3d 1182 (9th Cir.1996).

more compelling affidavits; there should, instead, be a trial on the merits.[74]

But, when dealing with expert testimony in a summary judgment motion (as well as at trial), the trial court *does* have the ability—indeed, the duty—to determine if the expert testimony should be admitted in the first instance. The judge becomes the "gatekeeper," keeping out unworthy or "junk" expert testimony. Although one of the reasons for the gatekeeper function is to keep unworthy expert testimony from confusing a jury, the gatekeeper function is applicable even to summary judgment motions in non-jury cases.[75]

In the *Daubert* case,[76] the United States Supreme Court explained the gatekeeper role of a federal trial judge in admitting expert scientific testimony. In the subsequent *Kumho Tire* case,[77] the court clarified that *Daubert* applied not only to scientific testimony, but to all expert testimony.

*Daubert* arose in the 9th Circuit,[78] in a case brought by the parents of two minor children who suffered serious birth defects. The mothers took the drug Bendectin before the children were born. It was marketed by the defendant, Merrell Dow Pharmaceuticals (Dow).

Dow brought a motion for summary judgment supported by the affidavit of a well-qualified physician and epidemiologist, who reviewed thirty published studies involving 130,000 patients. In none of the studies was Bendectin found to be the cause of the malformations suffered by the plaintiffs' children.

The plaintiffs defended against summary judgment by offering the testimony of eight experts, each of whom had impressive credentials.[79] These experts determined that Bendectin could cause the birth defects based upon three types of evidence: (a) *in vitro* (test tube) and *in vivo* (live) animal studies that found a link; (b) pharmacological studies of the chemical structure of Bendectin showing a similarity between the structure of Bendectin and other substances known to have caused birth defects; and, (c) a re-analysis of the published epidemiological studies. The district court denied admissibility of the testimony of the plaintiffs' experts.

This was upheld by the 9th Circuit Court of Appeals (citing *Frye v. United States*[80]) which held that expert opinion based on a scientific technique is inadmissible unless the technique is "generally accepted" as reliable in the scientific community.[81] The court held that the methodology of the plaintiffs' experts differed substantially from the procedures accepted by recognized authorities in the field.

On appeal, the Supreme Court determined that the seventy-year-old *Frye* test was no longer controlling, and that *Frye* had been succeeded by the legislatively adopted Rules of Civil Procedure, and in particular, FRE 702.[82]

The type of scientific, technical, or other specialized "knowledge" alluded to in FRE 702:

**74.** *Id.; Sugai v. General Motors Corp.*, 137 F.Supp. 696, 700 (D.Idaho 1956).

**75.** *In re Dow Corning Corp.*, 237 B.R. 364, 371, fn. 23 (Bankr.E.D.Mich.1999).

**76.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**77.** *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**78.** *See, Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 951 F.2d 1128 (9th Cir.1991).

**79.** *Daubert*, 509 U.S. 579, 113 S.Ct. at 2792, fn. 2.

**80.** 293 F. 1013, 1014 (D.C.App.1923).

**81.** *Daubert*, 509 U.S. 579, 113 S.Ct. at 2792; *Daubert*, 951 F.2d at 1129–1130.

**82.** *Daubert*, 509 U.S. 579, 113 S.Ct. at 2792–94.

... connotes more than subjective belief or unsupported speculation. The term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds."[83]

Basically, the court was speaking of valid scientific evidence which it referred to as having "evidentiary reliability—that is, trustworthiness."[84]

▪ The second prong of admissibility under FRE 702 is that the evidence must be relevant or assist the trier of the fact in understanding or determining a fact in issue.[85] The court must determine, pursuant to FRE 104(a), whether a scientific expert is proposing to testify about scientific knowledge that will assist the trier of the fact to understand an issue in fact.[86]

▪ To make this determination, the court suggested a number of possible tests or criteria. But it pointed out that it was not creating a definitive checklist, but only some helpful guidelines, not all of which (or perhaps any) are necessarily applicable in a specific given case.[87] In the case of the scientific evidence being offered by an expert, the court suggested that the following four factors might be considered:

- Has the theory or technique been tested?
- Has it been subject to peer review?
- Is there any known or potential rate of error?
- Does it have "general acceptance" in the scientific community?

▪ The court said: [88]

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate. [footnotes omitted]

*Daubert* was remanded to the 9th Circuit for application of the new standard, and that court again upheld the district court's decision.[89]

▪ In *In re Joiner*,[90] the Supreme Court determined that the standard of review, whether the expert testimony was admitted or excluded, was an abuse of discretion standard.

▪ In the *Kumho Tire* case,[91] the court noted:

... where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." [citation omitted]

*Kumho* involved injuries caused by a tire blowout. The tire manufacturer was sued. The plaintiff presented the testimony of an expert who had a master's degree in mechanical engineering and worked for ten years at Michelin America, Inc.[92] His qualifications were not questioned by the district court.

83. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2795.

84. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2795, fn. 9.

85. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2795–96.

86. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2796.

87. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2796; *United States v. Hankey*, 203 F.3d 1160, 1167–68 (9th Cir.2000).

88. *Daubert*, 509 U.S. 579, 113 S.Ct. at 2797.

89. *Daubert*, 43 F.3d 1311 (9th Cir.1995).

90. *General Electric Company v. Joiner*, 522 U.S. at 141–142, 118 S.Ct. at 517, 139 L.Ed.2d 508 (1997).

91. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. at 1175.

92. *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. at 1176–77.

The defendant tire company moved for summary judgment and the district court determined that the testimony of plaintiff's expert in response should be excluded. The expert had concluded that the tire failure occurred because of a defect in the tire rather than some other cause such as a blowout condition caused by under-inflation.[93] The district court questioned the reasonableness of the expert's approach and found it was too subjective.[94]

The 11th Circuit reversed, but was itself reversed by the Supreme Court, which approved of the district court's exclusion of the testimony based on the wide latitude or discretion it gave to the district court's ruling.

Finally, an expert's testimony can also be excluded where there is no proper factual foundation for the conclusion.[95] As I have alluded to before and will again, the biggest criticism Elggren had about Mac-Phee's analysis is principally backed up by his erroneous view of the facts surrounding the "$9,000,000" in ticket revenues. This is but one reason his expert opinion must be excluded.

4.3. *Mr. Elggren "Gets the Gate"* — Applying the general principles described in the *Daubert, Joiner, Kumho* trilogy discussed in part 4.2 of this *Memorandum*, it is readily apparent that the court should exclude the expert testimony of Wayne Elggren, notwithstanding his substantial qualifications.

The reasons, many of which have been broached in Part 2.4 of this *Memorandum*, are:

- Elggren has a gross misunderstanding of the facts which surrounded the "$9,000,000 in ticket revenue;"[96] that was a hypothetical figure, not an actual reflection of debtors' ticket revenue.

- Elggren's use of a 20% markup or 83.33% gross margin percentage is without substantial foundation. It does not appear to be based on any study of the debtors' records, but is based on an offhand remark by a travel agent about conditions that existed in the mid–1980's for Discount World Travel, which quit its business about the time Bonham began hers. This is speculative and unsubstantiated.

- Elggren points to a number of individual items which he views as incorrect and incorrectly analyzed by the trustee, but, in general, they do not amount to a substantial sum of money. Nor is there any indication from the few errors he has pointed out that such errors are rife in the trustee's calculations.

- Elggren indicates that the trustee uses the wrong methodology in arriving at gross income and suggests that the reservation cards themselves, as primary source documents, should have been reviewed. He has not given any indication that he has done this himself, even on a test basis, to show that MacPhee's analysis about the gross income of the ticket business is substantially incorrect.

- Elggren uses arguments which are undeniably fallacious or unsubstantial. For example, it is sophomoric to compare the high profits *realized* by certain mutual funds to those *promised* by debtors. And, suggesting that the debtors did not operate a Ponzi scheme because most Ponzi operations do not last seven years is a weak argument. There are a number of cases in which Ponzi schemes have lasted at least that long.

  He also makes a patently incorrect statement that "a 'Ponzi' opera-

**93.** *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. at 1172.

**94.** *Kumho Tire Company, Ltd. v. Carmichael*, 119 S.Ct. at 1177–78.

**95.** *Comer v. American Electric Power*, 63 F.Supp.2d 927, 934–36 (N.D.Ind.1999).

**96.** *See,* Part 2.4 of this *Memorandum* at 23.

tor is inherently insolvent at all times because with no source of 'income' except investor borrowing, each investment contract deepens his or her insolvency." In fact, most Ponzi schemes have at least a semblance, if not a somewhat substantial, operating "front."

• He has not explained the need for so many investors or investment contracts when the ticket buyers generally paid up front and the physical assets of World Plus were modest. How did Bonham wind up with $746,000 in outstanding investment contracts in 1989, increasing to $50,000,000 when debtors were shut down in December 1995?

• He is critical about methodology but has not shown by practical examples how the trustee's analysis is wrong or that his is better.

• Mr. Elggren criticized the trustee for not getting original frequent flyer mileage broker records listing approximately fifty-one frequent flyer ticket brokers.[97] He also criticized the trustee and MacPhee for utilizing the cost of tickets sold as derived from the broker books, summaries, and bank records, and suggests they should have relied instead on the reservation cards. Other than making these criticisms, the defendants have done nothing to back these assertions with any facts.

Elggren has not quantified what the analysis of the reservation cards would show, nor how it would differ from the trustee's and MacPhee's analyses. He appears principally to have seized on this because of the $9,000,000 ticket "revenue" he wrongfully deduced from the Delta Air Lines' settlement.

The defendants indicated in this proceeding that they themselves were investigating the frequent flyer mileage brokers to get the detail of Ms. Bonham's dealings with them. This was not anticipated to be an easy task, since many of these people were subject to suit by the airlines for violating frequent flyer mileage policy. Elggren has done nothing to quantify his findings about what the records of these frequent flyer brokers would show, not even one of them.

In short, I find that Elggren's report is based on substantial factual mistakes, speculation, innuendo, and inferences which are not supported by full explanations and analysis. It is not worthy of an expert of his caliber, nor worthy of admission as evidence in this case. His expert opinion will be excluded.

█ 4.4. *The Trustee's Analysis, Based on the Percentage Markup Method, is Reasonable and the Trustee Has Established a Six-Year Ponzi Scheme Beyond Question* —The methodology used by the trustee appears to be sound. MacPhee determined that the most reliable figures in the jumble of unorganized checks, commingled bank accounts and funds, and incomplete records, appear to be the amounts that debtors paid to purchase frequent flyer miles from brokers. MacPhee and the trustee derived these costs from every reasonably available source. MacPhee derived the percentage markup from monthly summaries prepared by Ms. Bonham at about the time the tickets were purchased.

Where the cost of goods sold and the gross profit percentage are known, the "percentage markup" method of deriving gross income is well recognized. For example, in *Webb v. Commissioner of Internal Revenue*,[98] the court said:

**97.** *Notice of Filing Faxed Declaration and Report*, at ¶ 16, Docket Entry 558, filed June 15, 1998.

**98.** 394 F.2d 366, 373 (5th Cir.1968); *Bollella v. Commissioner of Internal Revenue*, 374 F.2d 96 (6th Cir.1967), *affg.*, T.C. Memo., 1965–162, 1965 WL 954 (Tax Ct.1965); *Lambaiso v. Commissioner of Internal Revenue*, T.C.

For Webb the percentage markup method was the most reasonable means of computing income because his cost of sales in each taxable year was known with certainty. In comparison, net worth or bank deposit computations would lack any known figure because Webb transacted a substantial amount of his liquor business in cash, and he readily commingled cash flowing to and from personal and business expenses.

The trustee need not show that his analysis is exact to the penny, nor would anyone expect such accuracy from the records he had to deal with. It is enough to show that he has substantially captured the dynamics of debtors' business, and not grossly exaggerated the financial picture. Given the picture shown in the graph at the beginning of this *Memorandum*, he hardly needs to exaggerate or cut corners to show that the debtors operated a Ponzi scheme.

5. *CONCLUSION* —Given the ever increasing portfolio of investment contracts marketed by debtors from 1988, and the ever decreasing income and profitability from ticket sales, I conclude that debtors operated a Ponzi scheme as defined in Part 2.1 of this *Memorandum* for at least six years before the petition date.

I will enter an order that the existence of a Ponzi scheme for at least six years before the petition date has been established without substantial controversy.[99]

Memo. 1999–343, 1999 WL 818789 (Tax Ct.1999).

**99.** FRCP 56(d), incorporated by FRBP 7056.