454 P.2d 1004

The ASHTON COMPANY, INC., CONTRAC-
TORS AND ENGINEERS, Appellant,

v.

STATE of Arizona, Appellee.

No. 2 CA–CIV 599.

Court of Appeals of Arizona.

May 28, 1969.

Review Denied Sept. 23, 1969.

Hall, Jones, Hannah, Trachta & Birdsall, by Ben C. Birdsall, Tucson, for appellant.

Gary K. Nelson, Atty. Gen., Stanley Z. Goodfarb, Sp. Asst. Atty. Gen., Phoenix, for appellee.

HATHAWAY, Judge.

■ This is an appeal from a judgment in favor of the State in a suit by the appellant-contractor on an alleged claim arising out of a highway construction contract it performed for the State.[1] The case was tried to the court and extensive findings of fact and conclusions of law were entered. The facts, as found by the trial court, which we accept for lack of a "clearly erroneous" showing, Tuab Mineral Corporation v. Anderson, 3 Ariz.App, 512, 415 P.2d 910 (1966) ; Rule 52(a), Rules of Civil Procedure, 16 A.R.S., are as follows.

In December, 1961, the State advertised for bids on a highway construction project in Tucson. Ashton, a knowledgeable highway contractor who had entered into prior contracts with the State, sent for the

1. This court has previously reversed a summary judgment in favor of the contractor for the reason that a factual issue was presented, thus precluding summary judgment. See State v. Ashton Company, 4 Ariz.App. 599, 422 P.2d 727 (1967).

plans and a bid proposal. The construction project required, inter alia, the placement of large quantities of borrow [2] for the roadway embankment. The original plans showed the source of borrow as pit No. 5947, but prior to the bid opening date, the State notified all prospective bidders that pit No. 5947 could not fulfill the borrow requirements and that the additional borrow needed was to be obtained from pit No. 6165. Ashton received this information and based its bid on the anticipated use of pit No. 6165, the site of which was visited on several occasions by two of Ashton's representatives.

Included in the proposed plans were a number of sheets prepared by the Materials Division of the State Highway Department. These sheets contained sketches of material sources, test results on material sources, and subgrade information. The information sheets on pit No. 6165 were furnished to Ashton before bidding and were to be attached to the plans. The introduction to this "Materials Division Information" recited:

"Information contained in the following sheets is information developed by the Materials Division for the planning of this project. It is being made available to prospective bidders for information purposes only and is not to be considered a part of the contract papers. The information is developed as accurately as possible by the methods utilized, however, the State accepts no responsibility for any conditions encountered which may be at variance from information contained herein.

"Test analysis given in a pit tabulation is generally representative of the material in the test pit. However, in the case of pits containing considerable oversize (boulders and broken rock) too large to be conveniently placed in a sample sack, some portion of this oversized material may not be included in the sample, conse-quently, the analysis shown represents only the material without such oversize."

Included in the Materials Division Information sheets were sketches of pit No. 5947, showing its location, that test samples had been removed, and the results of certain tests. These results indicated that the State had tested only one hole, 0–4 feet depth from the surface, for density. Using this density test result, the Materials Division estimated that the weight of borrow from pit No. 5947 would run 125 pounds per cubic foot when compacted, allowing for a shrink factor of 20 per cent. This conclusion was relayed to the Contracts and Specifications Division prior to advertisement for bids. The tests of other samples indicated that the pit contained more than one type of material. In preparing the bid proposal and its own cost estimate, the Contract and Specifications Division used the weight of 125 pounds per compacted cubic foot to convert the cubic yards of borrow shown on the plans to an approximate tonnage quantity. It estimated that 783,000 tons would be the approximate weight of the volumetric quantity of borrow described in the plans.

The information sheets concerning pit No. 6165 included the results of testing done by the State on samples removed from 12 test holes. Among these tests was one density test on a hole located at a depth of 0–12 feet and 350 feet outside the pit boundary. Other tests results indicated the plasticity and gradation of the samples and that there were at least three different types of material in the pit. The Materials Division estimated that the weight of the borrow from pit No. 6165 would be 120 pounds per compacted cubic foot and have a shrink factor of 15 per cent and so informed the Contract and Specifications Division. The borrow tonnage estimate in the bidding schedule, already submitted to the prospective bidders, was not changed because the combination of the cubic weights used and the shrink factor applied

2. Borrow is any material used to build up a roadway embankment and is se-cured from a source away from the construction site and hauled to it.

gave a result close enough to each other to be insubstantial in bidding and estimating procedures.

The fact that the State's weight-to-cubic yards conversion factor was based on one shallow test in each pit and that, as to pit No. 6165, the test hole was not within the pit boundaries was apparent on the face of the Materials Division Information sheets. Ashton accepted the State's conversion factor for the reason that such information furnished by the Materials Division had been "historically correct."

The plans detailed the approximate quantity of borrow which would be required to construct the roadway: approximately 580,-000 cubic yards with an estimated shrink factor of 20 per cent, resulting in approximately 464,000 cubic yards of compacted borrow. This volumetric quantity was only an estimate, being subject to variables such as shrinkage and ground compaction. The borrow, along with ten other unit bid items, was required to be bid on a per ton basis. The bidding schedule showed an approximate quantity of 783,000 tons of borrow. Although the plans detailed the borrow quantities in cubic yards, a weight basis was used in the bidding schedule because the designated pits were located in the Santa Cruz River, thus making volumetric measurement difficult. Ashton submitted a bid of 40 cents per ton as to the borrow item. The first page of Ashton's bid proposal recited:

"The undersigned certifies that the approved Plans, Standard Specifications, July, 1960, Special Provisions and forms of Contract and Bond authorized by the Commission and constituting essential parts of this Proposal, have been carefully examined, and also that the site of the work has been personally inspected. The undersigned declares that the amount and nature of the work to be done is understood and that at no time will misunderstanding of the Plans, Specifications, Special Provision, or conditions to be overcome, be plead. On the basis of the Plans, Specifications, Special Provisions and the forms of Contract and Bond proposed for use, the undersigned proposes to furnish all the necessary machinery, tools, apparatus, and other means of construction, to do all the work and furnish all the materials in the manner specified and to finish the entire project within the time hereinafter proposed, and to accept, as full compensation therefor, the sum of the various products obtained by multiplying each unit price, herein bid for the work or materials, by the quantity thereof actually incorporated in the complete project, as determined by the Engineer. The undersigned understands that the quantities mentioned herein are approximate only and are subject to increase or decrease and hereby proposes to perform all quantities of work as either increased or decreased, in accordance with the provisions of the Specifications, at the unit price bid in the Bidding Schedule."

Ashton was the low bidder and was awarded the highway construction contract. The contract agreement, entered into voluntarily and fully understood by both parties, included the bidding proposal, plans, and the 1960 Standard Specifications of the Arizona Highway Department. It provided, inter alia:

"The party of the second part [Ashton] agrees that he has investigated the site of the work and all parts and appurtenances thereto and hereby waives any right to plead misunderstanding or deception as to location, character of work or materials, estimates of quantities or other conditions surrounding or being a part of the work and understands that the quantities given in the Bidding Schedule are approximate only, and hereby agrees to accept the quantities as actually placed and finally determined upon the completion of the work, in accordance with the Contract Documents.

"For and in consideration of the faithful performance of the work herein embraced, as set forth in the Contract Agreement, Specifications, Special Provisions, Bidding Schedule and all general

and detailed Specifications and Plans, which are a part hereof, and in accordance with the directions of the State Highway Engineer and to his satisfaction or his authorized agents, the said State of Arizona agrees to pay to said contractor the amount earned, computed from the actual quantities of work performed, as shown by the estimates of the State Highway Engineer, and the unit prices named in the attached Bidding Schedule and Supplementary Agreements made a part hereof, and to make such payments in the manner at the times provided in the Specifications hereto appended."

The 1960 Standard Specifications, part of the contract, provided:

"It is understood and agreed that the items of work shown in the bidding schedule are subject to increase or decrease in quantities during the progress of the work. * * *

"When a change made by the engineer or a change resulting from the contingencies of construction involves an increase or decrease of 25 per cent or less in the quantity of any contract item, as shown in the bidding schedule, the work as increased or decreased shall be performed by the contractor at the original contract unit price.

"Except as herein provided * * * the contractor shall accept payment in full at the contract prices for the actual quantities of work done. * * *

"Borrow shall be measured either by the cubic yard or by the ton.

*    *    *    *    *    *

"This item will be paid for at the contract price a cubic yard or a ton, as specified in the bidding schedule, for ITEM 21—BORROW, which price shall be full compensation for the item complete, as herein described and specified.

"Materials Division information showing the area limits of each pit, the estimated quantity of material available, the approximate location and depth of each test hole and other data, is available at the Materials Division. This information will be furnished the contractor as an attachment to the plans and is solely for informational purposes. This information is not to be construed as a guaranty of the area of the pit, nor of the quantity or depth of acceptable material.

"Attention is called to the fact that test holes may often be found outside the limits of acceptable material, and that the presence of test holes should not be taken as evidence of material acceptable for use on the roadway."

In computing its borrow bid, Ashton prepared a cost analysis using the cubic yard quantity as shown by the plans. It did not do any testing of its own but used the Materials Division information in the preparation of its bid. There was no other information, known to the State, which was withheld from Ashton prior to submission of its bid proposal.

The Contract and Specifications Division believed that the 783,000 tons shown in the bidding schedule would be the approximate weight of the cubic yard quantity of borrow shown in the plans. Within a month after commencement of the construction project, Ashton company's president was advised by the State resident engineer that the borrow material was less dense than estimated, but the borrow work continued. Data estimations on various items of construction work by persons experienced in the construction field is not an exact science and overruns and underruns of borrow is a common experience in roadway construction. The State's experience, governed by practical considerations, had been that only one density test per borrow pit was necessary notwithstanding the test result would not be representative of the density of all the materials in the pit.

Ashton performed all the work required as to the borrow portion of the contract. The final pay quantity for borrow was 656,187 tons. Whereas the estimated tonnage, 783,000, was based on a density of 125 pounds per cubic foot, the borrow

actually had a density of 105 pounds per cubic foot. The approximately 16 per cent difference in weight was due to the difference in density.

The trial court concluded from the foregoing that Ashton had failed to sustain its burden of proving (1) a breach of contract on the part of the State, (2) that the State was negligent in converting the volumetric quantity of borrow, (3) that the State had defrauded Ashton either actually or constructively, (4) that the State had been unjustly enriched, and (5) that there had been such a mistake, mutual or unilateral, to require reformation of the contract.

■ Ashton's contractual claim, i. e., breach of implied warranty, and fraud claim were predicated on the fact that the State furnished it with "plans representing that 464,000 cubic yards of compacted borrow would weigh approximately 783,000 tons." It contends, therefore, that since the volumetric quantity did not weigh the represented tonnage but in fact weighed only 656,187 tons, it was entitled to be paid the difference of 126,813 tons at 40 cents per ton, the bid price. In support of its position, it relies on cases such as Haggart Construction Company v. State Highway Commission, 149 Mont. 422, 427 P.2d 686 (1967); Healy v. Brewster, 251 Cal.App. 2d 541, 59 Cal.Rptr. 752 (1967); E. H. Morrill Company v. State, 65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551 (1967); Hollerbach v. United States, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); United States v. Atlantic Dredging Company, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920); Christie v. United States, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915); Walla Walla Port Dist. v. Palmberg, 280 F.2d 237 (9th Cir. 1960); Robert E. Lee & Company v. Commission of Public Works of City of Greenville, 248 S.C. 84, 149 S.E.2d 55 (1966).

These cases afforded relief to the contractor because he was either misled by affirmative false statements on the part of the government or· facts were known to the government which were not disclosed to the contractor. For example, in *Hollerbach,* supra, the government was held liable because " * * * the specifications spoke with certainty as to a part of the conditions to be encountered by the claimants." (34 S.Ct. at 555.) In United States v. Atlantic Dredging Company, supra, the representations made by the government were deceptive in that the test borings revealed information to the government, not imparted to bidders, of materials more difficult to excavate than those shown by the maps and specifications. In *Morrill,* supra, the plans contained a positive assertion as to the site condition. In *Haggart,* supra, materials reports were furnished to prospective bidders for the primary purpose of soliciting bids and bidders were expected to rely on the information.

There is no dispute here as to the facts but merely as to the legal conclusions to be drawn therefrom. No claim is made by Ashton that the State withheld any information. We believe the posture of this case is more closely analogous to Wunderlich v. State ex rel. Department of Public Works, 65 Cal.2d 777, 56 Cal.Rptr. 473, 423 P.2d 545 (1967) wherein the Supreme Court of California denied recovery to the contractor. In *Wunderlich* the court stated:

"When there is no misrepresentation of factual matters within the state's knowledge or withholding of material information, and when both parties have equal access to information as to the nature of the tests which resulted in the state's findings, the contractor may not claim in the face of a pertinent disclaimer that the presentation of the information, or a reasonable summary thereof, amounts to a warranty of the conditions that will actually be found." 56 Cal. Rptr. at 478, 423 P.2d at 550.

Ashton's bid proposal recited the fact of personal inspection of the work site and its understanding that the quantities mentioned in the bid proposal were approximate only. The contract contained an ·express

disclaimer of misunderstanding or deception as to the character of the materials or estimates of quantities. We do not conceive that the statement of the estimated tonnage is a " * * * 'positive and material representation as to a condition presumably within the knowledge of the government' * * *." (Hollerbach v. United States, supra, 34 S.Ct. at 554.) In effect, Ashton's position is that the State, by presenting its estimate of the weight of the required volumetric quantity of borrow, assumed liability for Ashton's assumption in bidding that 464,000 cubic yards of borrow would weigh 783,000 tons. However, the materials information furnished to Ashton clearly indicated the basis upon which the tonnage estimate had been made, i. e., a density report on material taken from *one* test hole. No proof was adduced that this test was incorrect and Ashton refrained from making its own tests because the State's information had been "historically correct."

The representation relied upon by Ashton is not cast in the form of a positive assertion of fact, but is given as an estimate, and there was full disclosure of the basis for the estimate. We therefore conclude that the disclaimer provision relating to quantities of material is controlling. Wunderlich v. State, supra; MacArthur Bros. Company v. United States, 258 U.S. 6, 42 S.Ct. 225, 66 L.Ed. 433 (1922); *see* also Inland Construction Company v. City of Pendleton, 116 Or. 668, 242 P. 842 (1926). The contract entered into between these parties was at arm's length; it required Ashton to make its own investigation concerning the character of the materials and conditions surrounding the work. No facts are presented which would justify surcharging the State for the risk which Ashton had undertaken by its contract. We find no breach of implied warranty.

■ Ashton's complaint alleged the traditional nine elements of fraud. *See* Moore v. Meyers, 31 Ariz. 347, 253 P. 626 (1927). However, the lack of a requisite element, i. e., a misrepresentation, is fatal to the fraud claim.

■ The trial court found that Ashton had failed to prove by a preponderance of the evidence that the State was negligent in converting the volumetric quantity of borrow shown on the plans to the estimated number of tons shown in the bidding schedule. Ashton contends that the State was negligent because of its failure to use ordinary care in selecting the samples to be used for testing purposes. Actually, the State took many samples and selected therefrom for density testing one which it considered representative of the pit materials. There was no showing that this test was negligently performed, inaccurately reported, or the density determination incorrect. Ashton's president stated, as a reason for relying thereon, that such test results were "historically correct." We fail to see how, under these circumstances, the State had a duty to make more than one density determination and find no error in the finding against Ashton on the negligence claim.

■ We also agree with the trial court's determination that Ashton had failed to prove that the contract agreement did not express the real agreement of the parties thereto, hence entitling Ashton to reformation. As stated in our previous decision in this case, State v. Ashton Company, 4 Ariz.App. 599, 422 P.2d 727 (1967):

> "To entitle one to reformation, it is essential to show that a definite *intention* on which the minds of the parties had met pre-existed the written instrument and that the mistake occurred in its execution. (citation omitted) If the minds of the parties had not met in a prior agreement, there is nothing to be corrected. (citation omitted)." 422 P. 2d at 730.

*See* also McNeil v. Attaway, 87 Ariz. 103, 348 P.2d 301 (1960); and Longshaw v. Corbitt, 4 Ariz.App. 408, 420 P.2d 980 (1966).

The "clear, convincing and satisfactory proof" requisite to reformation is lacking. The trial court found as a fact that both parties fully understood the terms and con-

ditions of the contract agreement. Such finding, which has not been demonstrated to be "clearly erroneous," negates any claim that the written contract agreement did not conform to the actual contract negotiated by the parties.

Ashton finally contends that it was entitled to recover under the doctrine of unjust enrichment. We summarily reject this contention for the reason that the doctrine has no application to a situation where there is an explicit contract which has been performed. Restatement of Restitution § 107; Ullmann v. May, 147 Ohio St. 468, 72 N.E.2d 63 (1947); Third Nat. Bank & Trust Co. v. Lehigh Valley Coal Co., 353 Pa. 185, 44 A.2d 571 (1945).

Finding no error in the determination below, the judgment is affirmed.

KRUCKER, J., and JOHN A. McGUIRE, Superior Court Judge, concur.

NOTE: Judge JOHN F. MOLLOY having requested that he be relieved from consideration of this matter, Judge JOHN A. McGUIRE was called to sit in his stead and participate in the determination of this decision.