**In re SOUTHWEST SUPERMARKETS, LLC, Debtor.**

**Daniel P. Collins, Trustee for the Bankruptcy Estate of Southwest Supermarkets, L.L.C.; Southwest Holdings, L.L.C., Plaintiffs,**

v.

**Kohlberg and Company, et al., Defendants.**

**Bankruptcy Nos. 2–01–14805– RJH to 2–01–14812. Adversary No. 03–00945.**

United States Bankruptcy Court, D. Arizona.

May 26, 2005.

**420**

Marty Harper, Gary D. Ansel, Kelly J. Flood, Andrew S. Jacob, Shughart, Thomson & Kilroy, P.C., Anthony R. Lucia, Curt W. Clausen, Lucia, Stark, Williamson, L.L.P., Phoenix, AZ, for Plaintiff Trustee.

Richard M. Lorenzen, Charles A. Blanchard, Perkins, Coie, Brown & Bain, P.A., Phoenix, AZ, Leslie G. Fagen, Robert N. Kravitz, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York City, for Defendants Kohlberg and Company, et al.

Michael R. Scheurich, Robert A. Shull, Mariscal, Weeks, McIntyre & Friedlander, P.A., for Defendants Edmond Beaith, Harold Gaubert, Jr., Lora Gentles, Erich Sielaff, Louis Vannatta, Andrew M. Vigil and John Williams.

Ronald W. Myers, Phoenix, AZ, for Defendant Bruce Kromer.

Richard A. Segal, Gust Rosenfeld P.L.C., Phoenix, AZ, for defendant Pack.

Doug Tobler, Hammond & Tobler, P.C., Phoenix, AZ, for Defendant Michael S. Geele.

## OPINION RE KOHLBERG'S MOTION TO DISMISS SECOND AMENDED COMPLAINT

RANDOLPH J. HAINES, Bankruptcy Judge.

Defendants' motion to dismiss argues that statutes of limitations bar the Trustee's claims for breaches of fiduciary duty and for avoidance of fraudulent transfers to themselves by the Debtor's managers. The Court concludes that the protections of statutes of limitations are not available to self-dealing fiduciaries. The Court also concludes that the discovery rule applicable to actual fraudulent transfers prevents the running of limitations against the hypothetical creditor of § 544(a)(2),[1] who is statutorily defined to lack knowledge of any wrongdoing. For these and other reasons, the motion to dismiss must be denied.

**Background Facts**

The Trustee's Second Amended Complaint (the "Complaint") portrays a milking[2] of the Debtor by its owners and managers from the time they took control of it until it filed bankruptcy. Because this is a motion to dismiss, these well-pleaded allegations of the Complaint must be treated as true.

---

1. Unless otherwise indicated, all chapter and section references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1330.

2. "Share-holders have been held liable for a corporation's debt because they have milked a corporation by payment of excessive dividends, by the sale of products to the shareholders at a reduced price, or by exacting unreasonable management charges." *Hambleton Bros. Lumber Co. v. Balkin Ent., Inc.,* 397 F.3d 1217, 1230 (9th Cir.2005), quoting *Amfac Foods, Inc. v. Int'l Systems & Controls Corp.,* 294 Or. 94, 654 P.2d 1092, 1102 n. 11 (1982).

On July 24, 1995, Kohlberg & Co. ("Kohlberg")[3] purchased Southwest Supermarkets ("Southwest" or the "Debtor"), which became its wholly owned subsidiary. Southwest then owned and operated approximately 23 retail grocery stores in and around Phoenix and Tucson, Arizona, and El Paso Texas. The purchase price was approximately $21.5 million. The Complaint alleges that Southwest was insolvent at the time of its acquisition, and that its assets were used to finance approximately half of the purchase price, rendering it even more insolvent.

As part of the acquisition, Kohlberg and Southwest entered into a "fee agreement" where Southwest agreed to pay Kohlberg a $1 million fee for its efforts in arranging the acquisition. Southwest also agreed to pay Kohlberg a management fee each year of either $200,000 or five percent of earnings before interest, taxes, depreciation and amortization ("EBITDA"), whichever was greater, for Kohlberg's management services. Such fees were paid based on positive EBITDA even though massive debt service, which is disregarded in the calculation of EBITDA, caused Southwest to operate at a loss most years. As Southwest was expanded to include 42 stores, its debt was increased from $9.75 million to $45.7 million, and its annual interest expense increased from $0.6 million to $7.3 million. Yet while Southwest lost more than $20 million in 1997, Kohlberg was paid a management fee of $200,000 based on positive EBITDA, and a $450,000 management fee in 1998 when Southwest lost more than $3.6 million. And because Southwest had its own President and CEO, there is no indication that Kohlberg actually provided any services for these "management fees."

Shortly after the acquisition in 1995, Kohlberg hired Jim Pack to serve as CEO and President of Southwest. Pack purchased a 2% interest in Southwest for $200,000. When Pack resigned as CEO in May of 1997, Southwest purchased his 2% interest for $1.5 million and his vested options for $1.869 million. Also in 1997, Jerome Miller, another Southwest officer, was paid $800,000 by Southwest for his vested options.

Southwest apparently also agreed to cover certain of the Kohlberg Defendants' tax liabilities arising from their ownership of Southwest. In 1996 and 1997, Kohlberg estimated that distributions of $5,829,664 were necessary to pay the tax liabilities arising from Southwest's expected profits, and Southwest paid this amount to Kohlberg. The tax liabilities that actually accrued for those years turned out to be approximately half of the amount that had been disbursed to Kohlberg, but Southwest never requested a reimbursement of the overpayment of approximately $2.9 million, and none was ever made. An email from the Debtor's CEO to Kohlberg just one month prior to Southwest's bankruptcy states that "All is quiet (at least within my privy) regarding the $2.9 million Company receivable from Kohlberg."

Southwest filed this Chapter 11 case in November, 2001. While Southwest was still debtor in possession, this Court approved a global settlement agreement among the Debtors, the secured creditors and the Official Unsecured Creditors' Committee. That agreement assigned to the secured creditors all of the "Kohlberg claims" of the Debtor and Debtor in Possession, which included all of the claims

---

**3.** The "Kohlberg Defendants" include Kohlberg & Company, L.L.C., KSSI G.P., Inc., KSSI G.P. II, Inc., KSSI Management, L.P., KSSI Acquisition Company, L.P., and KSSI Acquisition Company II, L.P.

now being asserted by the Trustee.[4] Very shortly thereafter, the Court granted the Debtors' motion for appointment of a Chapter 11 Trustee, and Daniel Collins was subsequently appointed Trustee on May 30, 2002. On or about September, 2003, the secured creditors re-assigned to the Trustee all the claims that had been assigned to them under the global settlement agreement. That re-assignment provides that any proceeds generated from the litigation of the Kohlberg claims be distributed to creditors according to the Code's priority scheme.

■ The Trustee filed the complaint initiating this adversary proceeding on November 4, 2003, just prior to expiration of the Code's two-year statutes of limitations,[5] and subsequently filed his First Amended Complaint. Kohlberg moved to dismiss it, largely on statutes of limitations grounds. The Court granted Kohlberg's motion with respect to many counts of the complaint, but granted the Trustee leave to amend to plead any reasons why the statutes of limitations should be tolled.[6] The Trustee filed the Second Amended Complaint (the "Complaint"), and Kohlberg has again moved for its dismissal, again largely on grounds of statutes of limitations. After supplemental briefing at the request of the Court and oral argument, the Court took the motion under advisement.

---

**4.** The settlement agreement defined the "Kohlberg claims" that were assigned to the secured creditors as "any and all causes of action that may exist against Kohlberg & Company or any of its subsidiaries or affiliates for payments and/or distributions made by the Debtors prior to the Petition Date." This definition would include both debtor causes of action and trustee causes of action, e.g., avoidance actions.

**5.** Bankruptcy Code § 108(a) provides that if a statute of limitations on a debtor cause of action has not expired as of the filing of the bankruptcy case, the trustee may assert such

## Self Dealing Fiduciaries Toll Statutes of Limitations

The Second Amended Complaint asserts causes of action for both breach of fiduciary duty and actual fraudulent transfers on account of: (1) the $2.9 million tax overpayments in 1996; (2) the $2.3 million paid in May 1997 to buy out the interests of the Debtor's CEO James Pack; and (3) payment of $3.6 million from 1995 to 1999 as "acquisition fees" and "management fees." Kohlberg has moved to dismiss all of these counts on grounds of statute of limitations, and argues that no discovery rule should bar the running of the statute because the Debtor's secured creditors (who assigned these claims to the Trustee) had an opportunity to discover the Debtor's true financial condition.

■ The Trustee responds that statutes of limitations should be equitably tolled for actions alleging fraudulent self-dealing by a fiduciary. The Trustee's position is well founded and well taken. Particularly Delaware law has held for more than sixty years that equitable tolling is appropriate for actions alleging self-dealing by corporate fiduciaries that results in insolvency:

> Sound public policy requires the acts of corporate officers and directors in dealing with the corporation to be viewed with a reasonable strictness....

a cause of action within the later of its ordinary limitations or two years after the filing of the bankruptcy case. Because this case was filed on November 11, 2001, that extended time would have expired on November 11, 2003. The statute of limitations on trustee causes of action is also two years after the filing of the case, pursuant to Code § 546(a)(1).

**6.** Collins v. Kohlberg and Company (In re Southwest Supermarkets, L.L.C.), 315 B.R. 565 (Bankr.D.Ariz.2004), hereafter "Collins I."

[W]here they are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but was serious breaches of trust, and will point the moral and make clear the principle that corporate officers and directors, while not in strictness trustees, will, in such case, be treated as though they were in fact trustees of an express and subsisting trust, and without the protection of the statute of limitations, especially where insolvency of the corporation is the result of their wrongdoing.[7]

Subsequent cases made clear that although actual knowledge of the wrongdoing would render this tolling doctrine inapplicable,[8] the doctrine is distinct from and does not require a showing of fraudulent conceal-

ment.[9] This history and doctrine was recently explained and followed by the First Circuit[10] and by an Oklahoma Bankruptcy Court, the latter of which concluded: "Thus, where a complaint satisfies the elements of a *prima facia* case for equitable tolling—*i.e.*, it contains allegations of self dealing for profit by a fiduciary—it is ordinarily inappropriate to summarily dismiss a claim as untimely under an otherwise applicable statute of limitations pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure."[11]

▪ Here the Defendants unquestionably had such fiduciary duties, and the complaint unquestionably alleges their self dealing for profit. Kohlberg was being paid fees to provide management for the Debtor. Due to the allegation of insolvency,[12] Southwest's managers owed fiduciary duties to Southwest's creditors.[13]

7. *Bovay v. H.M. Byllesby & Co.*, 27 Del.Ch. 381, 38 A.2d 808, 813 (Del.1944).

8. *Bokat v. Getty Oil Co.*, 262 A.2d 246 (1970).

9. *Kahn v. Seaboard Corp.*, 625 A.2d 269 (Del. Ch.1993).

10. *Niehoff v. Maynard*, 299 F.3d 41, 50 (1st Cir.2002) (applying Delaware law).

11. *In re Sheffield Steel Corp.*, 320 B.R. 405, 419 (Bankr.N.D.Okla.2004).

12. The Complaint alleges that even with $30 million booked as "goodwill" on Southwest's 1996 financial statement, it yielded a net worth of only $15 million. Complaint ¶ 40. That goodwill is undoubtedly due to a GAAP convention for recording the excess purchase price paid over the value of the assets. Because the Uniform Fraudulent Transfer Act defines solvency based on a "fair valuation" of the assets, A.R.S. § 44–1002(A), such GAAP conventions are not utilized and goodwill that is not realizable by creditors is disregarded. *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315, 330–31 (Bankr.C.D.Cal.1995).

13. "When a corporation becomes insolvent, its directors and officers become fiduciaries of

the corporate assets for the benefit of creditors." *A.R. Teeters & Assocs., Inc. v. Eastman Kodak Company*, 172 Ariz. 324, 333, 836 P.2d 1034, 1043 (App.1992). Although "the equitable trust fund doctrine has been the subject of considerable dispute," "it remains valid law in Arizona." *Id.* at 331, 836 P.2d at 1041. Because the doctrine "was judicially created to ensure that all creditors' claims are first equitably satisfied before stockholders may claim their rights upon the assets of an insolvent corporation," *id.*, its focus is protection of creditors rather than internal corporate governance. *See also Decker v. Mitchell (In re JTS Corp.)*, 305 B.R. 529, 535–41 (Bankr.N.D.Cal.2003)(discussion the evolution of the trust fund doctrine under Delaware law). Therefore the choice of law should be governed by the debtor's principal place of business, where the creditors are located, or where the liquidation occurs, rather than by the state of incorporation. Although neither the parties nor the Court has found an Arizona case addressing equitable tolling in the context of self-dealing by fiduciaries, the Court believes that Arizona would adopt the Delaware law, both because of its continued adherence to the corporate trust fund doctrine and because Arizona has recognized similar grounds for tolling statutes of

■ The complaint also adequately alleges self dealing for profit. Kohlberg required Southwest to pay to Kohlberg a $1 million acquisition fee that provided no apparent benefit to Southwest, but only to Kohlberg. Kohlberg required Southwest to pay it management fees based on an earnings formula that disregarded the massive debt obligations that Southwest incurred to generate such earnings, and that ultimately drove Southwest into bankruptcy. Kohlberg required Southwest to pay exorbitant sums upon the retirement of its CEO, far in excess of the value his stockholdings in an insolvent corporation could possibly have had. And this self dealing for profit continued right up until the filing of the bankruptcy, because despite Southwest's financial distress Kohlberg did not voluntarily repay the $2.9 million tax overpayment, nor require Southwest to demand it, but rather sought to keep "quiet" about it. Equitable tolling is appropriate "when a fiduciary of two corporations causes one corporation to pay money to the other for largely nonexistent services." [14]

The Court previously ruled that the Trustee cannot assert the Debtor's fiduciary duty claims against Kohlberg because Delaware law holds that the managers of a wholly owned subsidiary owe their fiduciary duties to the parent, not to the subsidiary.[15] But the Court also concluded that the Trustee can assert claims that were assigned to him by the secured creditors, notwithstanding *Williams*,[16] because the claims were assigned for the benefit of the estate with no special strings attached for the benefit of the assigning creditors.[17] That assignment consisted not only of the debtor and creditor claims the Trustee previously held and had assigned to the secured creditors, but also the claims that the secured creditors had previously held in their own right. Such claims may include breach of fiduciary duty claims. In addition' to those creditor fiduciary duty claims, Bankruptcy Code §§ 544(a) and (b) vest in the Trustee the creditors' fraudulent transfer claims.

Because the Complaint adequately alleges self dealing for profit by fiduciaries, equitable tolling should apply to bar the statute of limitations defenses asserted by those fiduciaries. The motion to dismiss Counts 1, 4, 5, 6, 8, 12 and 13 must therefore be denied.

## Code § 544(a) Gives Trustees Rights of Hypothetical Unknowing, Unsecured Creditors

Alternatively, the Bankruptcy Code itself may effectively toll the statute of limitations on these facts.

In addition to the rights of actual creditors that are vested in trustees by Code § 544(b), Code § 544(a) also gives trustees the rights of certain hypothetical creditors. In particular, Code § 544(a)(2) gives the trustee the rights of a creditor who extends credit on the date of the petition and who obtains an execution that is returned unsatisfied.

---

limitations in actions against fiduciaries. *See Waugh v. Lennard,* 69 Ariz. 214, 211 P.2d 806 (1949).

**14.** *End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.),* 250 B.R. 168, 193 (D.Del.2000), citing *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* 1995 Del. Ch. LEXIS 140, 1995 WL 694397 (Del. Ch.1995).

**15.** *Collins I,* 315 B.R. at 575–76.

**16.** *Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir.1988).

**17.** *Collins I,* 315 B.R. at 569–71.

■ While it is usually thought that § 544(a) merely provides the trustee an avoiding power, particularly the power to avoid unrecorded or secret liens, there is good authority that it was also intended to provide trustees with some affirmative rights of recovery. The predecessor to § 544(a)(2) was added to the Bankruptcy Act in 1910,[18] deleted in 1950,[19] and then restored in 1966.[20] The draftsman of that restoration explained that it was intended to permit a trustee to obtain equitable relief, such as an injunction, receivership or levy on an equitable asset, where state law would require an exhaustion of legal remedies as a condition of such equitable relief.[21] Despite the merger of law and equity, that requirement is apparently still alive, at least in federal courts.[22] Thus § 544(a)(2) was intended to permit the trustee to "bring a 'creditors' bill' to reach choses in action belonging to his debtor."[23]

A receiver appointed on such a creditors' bill may assert damage actions against those who harmed the corporation.[24] A creditors' bill is an appropriate remedy for shareholder "milking" of a corporation.[25]

■ Kohlberg is correct that the Trustee's standing under § 544(a)(2) to bring a creditors' bill only permits the Trustee to assert causes of action that the debtor corporation could have asserted.[26] That does nothing for this Trustee because, as noted above and as held in *Collins I*, this debtor corporation cannot assert breaches of fiduciary duty against its managers, who owed their duties solely to the parent, Kohlberg. But the intent behind § 544(a)(2) to make a creditors' bill available to trustees is nevertheless very significant because it demonstrates that some kinds of affirmative damages actions can be asserted under § 544(a)(2), not just avoidance of secret liens.

18. 4B COLLIER ON BANKRUPTCY ¶ 70.47[1], at 564 (14th Ed.1978)(hereafter *"Colliers"*).

19. *Colliers* ¶ 70.47[3], at 569.

20. *Colliers* ¶ 70.47[5], at 577.

21. Frank R. Kennedy, *The Bankruptcy Amendments of 1966*, 1 GA. L.REV. 149, 169 (Winter 1967); *Accord, Colliers* ¶ 70.64, at 730–31; Vern Countryman, *The Use of State Law in Bankruptcy Cases (Part II)*, 47 N.Y.U. L.REV. 631, 650 (1972). *See Freedman's Sav. & Trust Co. v. Earle*, 110 U.S. 710, 4 S.Ct. 226, 28 L.Ed. 301 (1884).

22. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999)("It was well established, however, that, as a general rule, a creditor's bill could be brought only by a creditor who had already obtained a judgment establishing the debt."). Curiously, while holding that federal equity jurisdiction could not permit injunctive relief prior to judgment because such relief was not available to English courts in 1789, the Court rejected an argument that the district court could have exercised such powers under state law in a diversity case. *Id.* at n. 3. The Court

declined to hear that argument because it had not been raised below. But the plaintiff was not obligated to raise it below because the plaintiff prevailed. The proscription against hearing arguments not raised below applies to the losing party, the appellant. The "respondent is entitled, however, to defend the judgment on any ground supported by the record." *Bennett v. Spear*, 520 U.S. 154, 166, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

23. *In re Western World Funding, Inc.*, 52 B.R. 743, 773 (Bankr.D.Nev.1985).

24. *E.g., Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir.1995).

25. *Hambleton Bros. Lumber Co. v. Balkin Ent., Inc.*, 397 F.3d 1217, 1232 n. 16 (9th Cir.2005), quoting *Amfac Foods, Inc. v. Int'l Systems & Controls Corp.*, 294 Or. 94, 654 P.2d 1092, 1102 n. 16 (1982).

26. "[T]he general proposition is apparent that the creditor is entitled to realize on whatever property the debtor may himself be able to realize on." GARRARD GLENN, THE RIGHTS AND REMEDIES OF CREDITORS RESPECTING THEIR DEBTOR'S PROPERTY, § 25, at 23 (1915).

Probably most kinds of affirmative relief that a trustee might seek would not be available under § 544(a)(2), because a creditor who extends credit on the date of petition will always.have become a creditor *after* the wrong complained of. Consequently the kinds of actions that trustees might be able to bring under § 544(a)(2) will always be limited to those for which remedies are available to subsequent creditors, and these may be rare. One of them that does appear to be available, however, is an action for an actual fraudulent transfer. Under the Uniform Fraudulent Transfer Act, a transfer made with actual intent to hinder, delay or defraud creditors is fraudulent as to both present and future creditors,[27] as compared to constructive fraudulent transfers that are deemed fraudulent only as to existing creditors.[28] Another that might be available is creditors' breach of fiduciary duty claims when insolvency has shifted the managers' fiduciary duties from shareholders to creditors. Such claims may also be available to those who became creditors after the point of insolvency, and hence to the creditors who extended credit on the date of the petition. Here, this means that the Trustee can assert creditors' breach of fiduciary duty claims, even though no such claims are assertable on behalf of the Debtor.

The availability of affirmative relief under Code § 544(a)(2) may have broader significance. For example, it may explain why § 544(a) vests the trustee with "rights and powers" of such creditors expressly *in addition to* their avoidance actions, whereas § 544(b) only vests avoidance rights. It may provide a precise statutory basis for the conclusions of some courts that trustees can bring those kinds of affirmative actions, such as piercing the corporate veil, that are generally available to all creditors and not personal to particular creditors, even if under applicable state law the debtor corporation could not pierce its own veil.[29] It may resolve trustees' *in pari delicto* problem,[30] at least where state law would free a receiver from that defense.[31]

But the Trustee's standing under § 544(a) has another significance here. Actions brought by trustees under § 544(a), unlike those assertable under § 544(b), are assertable "without regard to any knowledge of the trustee or any creditor." Consequently, if the limitations on such an action is subject to a discovery

---

**27.** A.R.S. § 44–1004(A); Uniform Fraudulent Transfer Act § 4(a).

**28.** A.R.S. § 44–1005; Uniform Fraudulent Transfer Act § 5.

**29.** *E.g., St. Paul Fire and Marine Ins. Co. v. PepsiCo Inc.,* 884 F.2d 688, 700–01 (2d Cir. 1989); *Koch Refining v. Farmers Union Central Exchange, Inc.,* 831 F.2d 1339, 1348–49 (7th Cir.1987); *C.B.S. Inc. v. Folks (In re Folks),* 211 B.R. 378 (9th Cir.BAP1997); *Western World Funding, Inc.,* 52 B.R. 743, 773 n. 9 (Bankr.D.Nev.1985).

**30.** *See* Tanvir Alam, "Fraudulent Advisors Exploit Confusion in the Bankruptcy Code: How *In Pari Delicto* Has Been Perverted to Prevent Recovery for Innocent Creditors," 77 Am. Bankr.L.J. 305 (Issue 3, 2003). The "problem" arises because such claims vest in the trustee pursuant to Code § 541, which has been interpreted as defining the trustee's rights by the facts as they existed "as of the commencement of the case." *E.g., Official Comm. Of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand,* 322 F.3d 147 (2d Cir.2003); *Official Comm. Of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340 (3d Cir.2001).

**31.** *Scholes v. Lehmann,* 56 F.3d 750, 754 (7th Cir.1995)("[T]he defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated" and replaced by a receiver)(applying Illinois law); *F.D.I.C. v. O'Melveny & Myers,* 61 F.3d 17, 19 (9th Cir.1995)("[D]efenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver.")(applying California law).

rule, such as the discovery rule for actual fraudulent transfers,[32] the action is assertable on behalf of the hypothetical creditor who is hypothesized to have had no knowledge of the wrongdoing. Thus even if the secured creditors should have known of the Debtor's true financial condition and the Kohlberg defendants' self-dealing, the hypothetical § 544(a)(2) creditor is not burdened with such knowledge.

In effect this may mean that there is no statute of limitations for those few kinds of actions that may be maintained by a subsequent, innocent creditor. This may seem surprising at first blush, but on further reflection it is not all that unusual. As noted above, for sixty years Delaware has effectively eliminated any statute of limitations for actions against self-dealing fiduciaries. And there has never been a statute of limitations for some other remedies, such as piercing the corporate veil, equitable subordination, the "Deep Rock" doctrine,[33] and substantive consolidation. Such liabilities that are not subject to statutes of limitation should have already put corporate fiduciaries on notice that no running of time will absolve them of their misuse of the corporate form to the detriment of innocent creditors.

The lack of knowledge of the hypothetical creditor of § 544(a)(2), coupled with the discovery rule applicable to breaches of fiduciary duty and actual fraudulent transfers, also means that Kohlberg's motion to dismiss these counts on statute of limitations grounds must be denied.

**The Tax Advance Overpayment Claim Survives**

In 1996, Southwest Supermarkets paid Kohlberg $2.9 million more than was required by the operating agreements to cover Kohlberg's tax liability as a result of owning Southwest Supermarkets. Count 2 of the Second Amended Complaint seeks to recover this amount on a theory of unjust enrichment. Kohlberg has moved to dismiss Count 2 on two grounds: (1) because the claim is time barred by a three year statute of limitations under either Delaware or Arizona law; and (2) because no liability for unjust enrichment can exist when the parties' relationship is governed by a specific contract.

■ On the statute of limitations issue, the Trustee does not dispute that the action was governed by a three year statute, but argues that the liability did not arise until the filing of bankruptcy. The Trustee relies on an October 18, 2001 memorandum from the Debtor's CEO to Kohlberg, which described the tax overpayment as "the $2.9 million Company receivable from Kohlberg." Kohlberg has not denied the existence of that memo nor argued that Kohlberg responded by denying that it was a receivable. While this is a motion to dismiss rather than a motion for summary judgment, so those facts are not necessarily established, they do demonstrate the likelihood that the Debtor will be able to prove that both the Debtor and Kohlberg regarded the tax overpayment to be a receivable as of the time of the filing of the bankruptcy.

The Trustee also argues that because there was no express contractual provision governing refund of such an overpayment, the understanding was that it would be used to reduce subsequent obligations of

---

**32.** A.R.S. § 44–1009; Uniform Fraudulent Transfer Act § 9.

**33.** The "abuses in management" and undercapitalization that supported subordination of Standard's claim extended back 15 years before Deep Rock's § 77B case was filed. *Taylor v. Standard Gas & Electric Co.,* 306 U.S. 307, 310–11, 59 S.Ct. 543, 83 L.Ed. 669 (1939).

Southwest Supermarkets to cover such Kohlberg tax liabilities. The Trustee argues that the unjust enrichment claim therefore arose only upon the filing of bankruptcy, which effectively determined that there would be no such future tax obligations.

On this motion to dismiss, it appears the Trustee could prove facts supporting a legal conclusion that an obligation to repay the overpayment only accrued upon the filing of the bankruptcy case. The motion to dismiss based on statute of limitations grounds must therefore be denied.

■■■ Kohlberg also argues that an unjust enrichment claim is barred because of the existence of a contract that governs the relationship of the parties, citing two Arizona cases and a Delaware case. None of those cases, however, concerns a situation where a party overpaid what a contract required. In *Ashton*,[34] a construction contract called for the contractor to be paid 40 cents per ton of the amount of borrow the contractor was required to supply to the job site. The contractor bid the judgment based upon the State's estimate of the tonnage of borrow that would be necessary. In fact, however, the tonnage ultimately required was less than had been estimated, because the borrow used was less dense than the State had estimated it. The contractor sued to be paid the amount that had been estimated, asserting various legal theories.

The court rejected the contractor's unjust enrichment claim "summarily" · because the doctrine has no application where there is an explicit contract that has been performed.[35] That conclusion has no bearing, however, where a party has paid more than required by a contract. In

*Ashton,* for example, the contractor did not perform more work than was called for by the contract. To the contrary, the contractor actually moved less tonnage than the parties had estimated, but wanted to be paid on the basis of the erroneous estimate rather than on the basis of what the contractor actually supplied.

Similarly, *Brooks*[36] was a suit by a borrower seeking to collect interest on the amounts the borrower was required to pay the lender for real property tax and insurance impounds. The Arizona Supreme Court denied the claim because the contract required the borrower to pay the impounds and did not require the lender to repay interest on those amounts. The court denied the unjust enrichment claim based on Restatement of Restitution § 107, Comment (1)(a), which provides that unjust enrichment does not lie where one receives from the other that which it was agreed he should receive. The court's reference to the existence of a contract barring an action for unjust enrichment obviously does not apply where one party paid more than the contract required.

■■■ Here, there is apparently no contract that required the Debtor to pay Kohlberg the excess $2.9 million in 1996, nor is there any contract that expressly required Kohlberg to repay such amount. In the absence of such contractual rights, a claim for unjust enrichment may be allowed where the Plaintiff can show: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment; and (5) an absence of a remedy

---

**34.** *Ashton Company Inc. v. State of Arizona,* 9 Ariz.App. 564, 454 P.2d 1004 (1969).

**35.** 454 P.2d at 1010.

**36.** *Brooks v. Valley National Bank,* 113 Ariz. 169, 548 P.2d 1166 (1976).

provided by law.[37] Kohlberg has failed to establish that any of those elements is lacking here. To the contrary, it affirmatively appears that Kohlberg was enriched by $2.9 million, that the Debtor was impoverished to that extent, that there is a precise correlation between those amounts, that Kohlberg has no justification for its enrichment or the Debtor's impoverishment, and that there is no other remedy provided by law. Consequently Kohlberg's motion to dismiss the unjust enrichment Count 2 must be denied.

 While there ultimately cannot be liability both for unjust enrichment and breach of contract, a plaintiff is entitled to plead in the alternative.[38] The Trustee has pled facts from which a jury could conclude that both the Debtor and Kohlberg regarded the $2.9 million as a receivable due the Debtor from Kohlberg, right up until the filing of bankruptcy. This implies the parties recognized the existence of a contractual obligation to pay that amount, even though no such term can be found in any of the written contracts. Consequently Kohlberg's motion to dismiss Count 3 must also be denied.

## Deepening Insolvency May Provide A Measure of Damages

Kohlberg has moved to dismiss the "deepening insolvency" claim asserted by Count 7 of the Second Amended Complaint on several grounds: (1) statute of limitations; (2) failure to state a claim because deepening insolvency is not a recognized cause of action; and (3) failure to state a claim because the complaint fails to allege that the increased debt was incurred fraudulently.

The Trustee responds, however, that "the Complaint uses deepening insolvency as a measure of damages, not as a cause of action."[39] The Trustee argues that deepening insolvency is pled as a damages theory for causes of action based on breach of fiduciary duty (Count 7), gross negligence and mismanagement (Count 10), and assisting in the breach of fiduciary duty (Count 13).

 The Trustee's characterization of the Second Amended Complaint is correct. A motion to dismiss is not an appropriate procedure to test the Trustee's deepening insolvency theory of damages. The complaint adequately specifies other damages, such as the acquisition and management fees, tax overpayment and Pack buyout, that are sufficient to state a claim for breach of fiduciary duty. The Court therefore need not now determine whether the Trustee may also be able to prove whether additional damages also flowed from the Defendants' breaches of fiduciary duty.

Kohlberg's motion to dismiss Count 7 for failure to state a claim for relief for deepening insolvency must therefore be denied, because Kohlberg's motion does not establish that it fails to state a claim for breach of fiduciary duty. Kohlberg's motion to dismiss Count 7 as being time barred must also be denied, because the Court has already concluded that the statute of limitations does not bar the Trustee's claim for breach of fiduciary duty.

## Payment of Debts Fraudulently Incurred May Be Actual Fraudulent Transfers

Count 12 of the Second Amended Complaint alleges that all of the transfers of

---

**37.** *Community Guardian Bank v. Hamlin*, 182 Ariz. 627, 630, 898 P.2d 1005 (Ariz.App. 1995).

**38.** Bankruptcy Rule 7008, incorporating F.R.Civ.P. Rule 8(e).

**39.** Plaintiff's Supplemental Brief at 19.

Southwest Supermarkets' funds to the Defendants were made for less than fair consideration and rendered Southwest Supermarkets insolvent. The Count also alleges that these transfers were done intentionally with an "evil mind," for the Defendants' own benefit, and with reason to know or conscious disregard of the substantial risk that the transfers would damage Southwest Supermarkets and its creditors.

In *Collins I,* this Court held that constructive fraudulent transfer claims for payments made prior to November 1997 are barred by the statute of limitations.[40] Kohlberg now moves to dismiss Count 12 as failing to state a claim for an actual fraudulent transfer pursuant to A.R.S. § 44–1004(A)(1). Kohlberg argues that the acquisition and management fees cannot be actual fraudulent transfers because they were paid pursuant to a contract. Kohlberg also argues that the tax overpayment cannot be an actual fraudulent transfer because it arose from the innocent miscalculation of the amount required to be paid pursuant to a contract to cover Kohlberg's tax liabilities arising from its ownership of Southwest Supermarkets.

 Count 12 is not very artfully drafted if it is interpreted as asserting a claim for actual fraudulent transfer. Beyond the conclusory allegation that the transfers were done with "an evil mind," Count 12 only references two facts: that the transfers were for less than fair consideration and that they rendered Southwest Supermarkets insolvent. These facts are more suggestive of a constructive fraudulent transfer than an actual fraudulent transfer.

Such facts are, however, also "badges of fraud" that may give rise to an inference of actual intent to hinder, delay or defraud creditors.[41] When coupled with the pleading of "an evil mind," such allegations are therefore sufficient to state a claim for actual fraudulent transfer under the rules of notice pleading.

Kohlberg's argument that the transfers were made pursuant to a preexisting contract is often sufficient to defeat a claim for fraudulent transfer. This is because performance of a contract is, in essence, satisfaction of a debt, and satisfaction of a debt generally provides reasonably equivalent value for the amount transferred. Consequently although performance of a contract or payment of a debt may be avoidable as a preference, it is usually not avoidable as a fraudulent transfer. One leading scholar of fraudulent transfer law repeatedly stated in his treatise that a preference, as such, can never be a fraudulent transfer.[42]

There is a substantial caveat to that broad proposition, however, and that is where there are other badges of fraud present, such as an insider relationship between the debtor and the payee.[43] In fact, this caveat is perhaps best illustrated by the case that gave rise to the badges of fraud, *Twyne's Case.* It is often overlooked that Coke's report actually states that the debtor Pierce "was indebted to Twyne in four hundred pounds," and "being pos-

---

**40.** 315 B.R. at 576.

**41.** A.R.S. § 44–1004(b)(8) & (9).

**42.** "[W]e are now to ask whether a preference, as such, is a fraudulent conveyance. The answer is certainly, No; and of that the reader may rest assured. If there is in our law one point which is more ungrudgingly accepted than others, it is that the preferential transfer does not constitute a fraudulent conveyance. The 'past consideration' is the 'good consideration' that the Statute of Elizabeth requires." I Garrard Glenn, Fraudulent Conveyances and Preferences § 289, at 488 (Rev. Ed.1940). *See also* II Glenn, § 382, at 661.

**43.** *Id.* § 289(a), at 493.

sessed of goods and chattels of the value of three hundred pounds, in secret made a general deed of gift of all his goods and chattels, real and personal whatsoever to Twyne, in satisfaction of his debt."[44] While payment of such debts alone should not have constituted a fraudulent transfer, Coke concluded that the transfer was fraudulent because of the presence of badges of fraud such as the fact that the debtor retained possession of the sheep and they remained branded with the debtor's brand. Similarly, payment of a debt incurred as part of a fraudulent Ponzi scheme may be a fraudulent transfer.[45]

Here, as noted above, there are two badges of fraud specifically referenced in Count 12 itself. Moreover, the transfers were to insiders, which is another badge of fraud.[46] More importantly, the contracts that gave rise to the obligations to pay the acquisition fee, management fee and tax advances may themselves have been obligations incurred with an actual fraudulent intent to hinder, delay or defraud creditors. They are alleged to be part of a broad scheme to milk the debtor. Indeed, they bear the same badges of fraud, including being a transaction with an insider, for which the Debtor may not have received reasonably equivalent value while insolvent. Obviously if the underlying contracts are avoidable as fraudulent transfers, then the Debtor did not receive reasonably equivalent value by satisfying an obligation that is void or voidable.

Kohlberg's motion to dismiss Count 12 must therefore be denied.

## Dissolved Partnerships

Finally, Kohlberg moves for dismissal from the complaint of three Delaware Limited Partnerships that were dissolved and filed certificates of cancellation on May 16, 2003.[47] Kohlberg argues that after the filing of the certificate of cancellation, these limited partnerships ceased to exist and therefore cannot be sued.

If Kohlberg is correct, the point is both moot and Kohlberg lacks standing to argue it. If there is no entity there, then the Trustee's suit will gain him nothing but similarly cause harm to no one. But if there is no such entity, then who hired Perkins Coie Brown & Bain and Paul, Weiss, Rifkind to seek its dismissal? If the limited partnerships did so, they must exist and have assets sufficient to pay their lawyers. But if they did not do so on their own behalf, then who did? It is difficult to see how the other Kohlberg defendants would have standing to move for their dismissal.

Kohlberg's motion to dismiss the dissolved limited partnerships is therefore denied.

Dated this 26th day of May, 2005.

44. *Twyne's Case*, 3 Coke 806, 76 Eng. Rep. 809 (Star Chamber, 1601), reprinted in Elizabeth Warren and Jay Lawrence Westbrook, The Law of Debtors and Creditors, at 127–28 (4th Ed.2001).

45. *E.g., Hayes v. Palm Seedlings Partners (In re Agricultural Research and Technology Group)*, 916 F.2d 528 (9th Cir.1990); *In re Bonham*, 251 B.R. 113 (Bankr.D.Alaska 2000).

46. A.R.S. § 44–1004(B)(1).

47. The three defendants are KSSI Acquisition Company, L.P.; KSSI Acquisition Company II L.P.; and KSSI Management L.P.